

**SCHIFFMAN LAW OFFICE, P.C.**
HELPING THE INJURED AND DISABLED SINCE 1975

Lisa Counters, 016436
4506 N 12th Street
Phoenix, AZ 85014-4246
Voice: (602) 266-2667
Fax: (602) 266-0141
Lisa@Schiffmanlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Marcus,<br><br>       Plaintiff,<br><br>vs.<br><br>Lincoln National Life Insurance Company,<br><br>       Defendant. | No. 2:24-cv-00228-ROS<br><br>**PLAINTIFF'S OPENING BRIEF** |

Defendant Lincoln National Life Insurance Company ("LFG") paid Leslie Marcus ("Leslie") long-term disability ("LTD") benefits for 24 months, then denied her claim because it determined she could perform "any occupation." LFG's decision was arbitrary and capricious. It was tainted by its conflict of interest and relied solely on paper reviewers who cherry-picked medical evidence and misrepresented contact with treating providers. Her condition has not improved; she remains disabled due to her diagnosis of Chronic Fatigue Syndrome ("CFS") and related conditions, and is unable to work in any capacity.

## I.    ADMINISTRATIVE PROCESS SUMMARY

Leslie worked for Balfour Beatty Investments ("Balfour") as a Regional Property Manager since September 14, 2015. (Dkt. 21-3 at 1)[1] Balfour provided its employees LTD benefits through LFG. (*See* Policy at Dkt 21-1, 1-47)

Leslie was involved in a motor vehicle collision in 2017. (Dkt. 21-3 at 138) She was rear-ended while stopped on the highway and immediately had neck and back pain, along with cervical and lumbar spine disc injuries. (*Id.*) Leslie's health deteriorated rapidly, and she began experiencing shaking and tremors in 2018. (Dkt. 21-12 at 210) She last worked on April 13, 2019. (Dkt. 21-3 at 1) She filed a claim for short-term disability ("STD") benefits on April 12, 2019. LFG paid her full benefits for STD. LFG transitioned Leslie to LTD on October 17, 2019. (*Id.*) For the first 24 months, the policy defines disability as the inability to perform the Material and Substantial Duties of [her] Own Occupation. (Dkt. 21-1 at 0007). LFG paid Leslie through the 24-month own occupation period. (*See* 21-2 at 1)

After 24 months, disability is measured by the person's inability to "perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (Dkt. 21-1 at 0007) On August 12, 2021, LFG advised Leslie that it was terminating her benefits because she did not meet the own occupation disability definition. (Dkt. 21-4 343-47) LFG relied on a paper reviewer's discussion with treating provider Nurse Practitioner Tonia Graham in the denial letter. The denial also referenced "investigative reports" that showed activity greater than Leslie's self-described limitations. LFG determined that Leslie could do sedentary work and that her skills translated to being a Title Search Manager, an Employment (sic) Manager, or a Sales Manager.

Leslie appealed LFG's decision. (Dkt. 21-3 at 647-59) The appeal explained that LFG's denial of benefits was incorrect because LFG's paper reviewers, while recognizing Leslie's CFS diagnosis, ignored the impact that CFS has on Leslie's energy levels and ability to sustain full-time employment. (*Id.*) On March 27, 2023, LFG provided Leslie with new

---

[1] The Administrative Record is filed at Dkt. 21- to 21-13 References will be cited as follows: (i.e., Lincoln/Marcus 00047 is cited as Dkt. 21-3 at 1).

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12ᵀᴴ STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

peer and vocational reviews, suggesting it intended to deny Leslie's claim again. Leslie responded to the new peer and vocational reviews on March 29, 2023, requesting additional documents that LFG failed to provide and to which Leslie was entitled. (Dkt. 21-3 at 436-37) Again, on June 12, 2023, LFG provided addendums from the same peer reviewers and provided Leslie time to respond. (Dkt. 21-3 at 287-89) Leslie and LFG exchanged information and documents, but LFG issued its final denial on November 3, 2023. (Dkt. 21-2 at 2-10) This lawsuit followed on February 1, 2024.

## II.    LESLIE'S MEDICAL CONDITION

### A.    *Marcus suffers from a significant downward trend in her health.*

Before she began suffering from her disabling medical conditions, Marcus engaged in an active lifestyle. (Dkt. 21-3 at 124) She worked full-time at Balfour Beatty Construction as a Regional Property Manager, managing military housing at various military installations. (*Id.*) After the motor vehicle collision in 2017, Leslie's health deteriorated rapidly, and she began experiencing shaking and tremors in 2018. (Dkt. 21-12 at 210) Leslie developed atrial fibrillation and required a cardiac ablation on December 26, 2018. (Dkt. 21-3 at 112) On January 17, 2019, approximately three weeks after the ablation and following a night of vomiting, she was evaluated in the emergency room by Dr. Lindsey Bayer, where she was diagnosed with supraventricular tachycardia. (Dkt. 21-3 at 445-46)

Following her discharge, she continued experiencing symptoms, including fatigue and related symptoms, with significantly compromised cardiac capacity and stamina. (Dkt. 21-3 at 124; 219-24; 445-46) She subsequently underwent multiple medical encounters, including an emergency room visit on April 12, 2019, by Dr. Pedro Roque, for tachycardia, shortness of breath, intermittent chest pain, and anxiety. (Dkt. 21-3 at 446) Less than a month later, on May 4, 2019, she was again seen in the emergency room. (Dkt. 21-3 at 445-47) Additional emergency room visits followed on October 21, 2019 and November 14, 2019. (Dkt. 21-3 at 445-447) LFG approved Marcus's LTD claim by letter dated November 19, 2019. (Dkt. 21-10 at 303-307)

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12ᵀᴴ STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

On January 30, 2020, during a visit with Dr. Larry Bergstrom, a Mayo Clinic physician, Leslie was diagnosed with myalgic encephalitis/chronic fatigue syndrome ("ME/CFS") and Postural Orthostatic Tachycardia Syndrome ("POTS"). (Dkt. 21-3 at 219-224) In a progress note dated October 15, 2020, Dr. Bergstrom noted that Leslie remained "extremely disabled." (Dkt. 21-3 at 473) Following Dr. Bergstrom's diagnosis, Leslie continued treatment with NP Graham, who has continued to document the "lethargy, malaise, and exercise intolerance" that Leslie experiences. (Dkt. 21-12 at 124-27; 128-31; 132-35, 136-43, 140-43; 144-47, 148-52, 153-56; 157-60; 162-67) As of an October 20, 2022 office visit, NP Graham noted that Leslie "lacks endurance and strength." (Dkt. 21-12 at 124-27) All of Leslie's doctors concur that she suffers from CFS. The CFS diagnosis is consistent with the challenges she experiences in her daily life due to her condition. Her stamina and cardiovascular functioning are impacted to the point that she requires a wheelchair to navigate airports. (Dkt. 21-3 at 124) She also experiences significant nausea and vomiting, which impacts her ability to eat, and a corresponding low BMI. (*Id.*)

In a letter dated August 12, 2021 to LFG, NP Graham disputed the findings of LFG's claims examiner, who had concluded, following a conversation with NP Graham, that Leslie was no longer disabled. (Dkt. 21-4 at 311) In that letter, NP Graham ardently disputed LFG's account of the conversation, explaining that there was nothing to preclude Leslie from disability, as she still was being medically evaluated. (*Id.*) NP Graham explained that Leslie's doctors were still gathering information and evaluating her neurological conditions, and that she was referring Leslie to physical therapy and neuropsychology with Dr. Dane A. Higgins of CNS Memory Clinic. (*Id.*) NP Graham opined that she was "confident" those evaluations would demonstrate that Leslie was not "malingering." (*Id.*)

### B.    *Leslie's Medical Diagnoses*

#### 1.    **Myalgic Encephalitis/Chronic Fatigue Syndrome**

Though Leslie was diagnosed with CFS by in January 2020, she began reporting related symptoms in February 2019. (Dkt. 21-3 at 219-24) CFS is a multi-systemic disease,

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12ᵀᴴ STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

organic in origin, where the primary symptom is extreme, debilitating fatigue. While there are many suspected causes of the disease, there is no definitive etiology. During her January 30, 2020 visit with Dr. Bergstrom, Leslie reported profound fatigue, post-exertional malaise, brain fog, widespread musculoskeletal pain, breathlessness, dizziness, and episodes of syncope. NP Graham has continued to document the "lethargy, malaise, and exercise intolerance" that Leslie experiences. (Dkt. 21-12 at 124-27, 128-31, 132-35; 136-39, 140-43, 144-47, 148-52, 153-56, 157-60) As of an October 20, 2022 office visit, NP Graham noted that Leslie "lacks endurance and strength." (Dkt. 21-12 at 124-27) All of Leslie's doctors concur that she suffers from CFS, and LFG agreed with this diagnosis 24 months before then determining that she no longer experienced any limitations preventing her from full-time work.

Leslie's medical records contain numerous references regarding her diagnosis of CFS and the expected symptoms. Her treating physicians and LFG's peer reviewers support this diagnosis (Dkt. 21-3 at 20-23, 21-8 at 44-45, Dkt. 21-10 at 70-73) LFG cannot disregard the effects of constant, chronic, and debilitating fatigue on Leslie's inability to perform the duties of her occupation as a Regional Property Manager or any other occupation.

### 2.    Leslie's Conditions Arising from Her Autoimmune Disorder

#### a.    Postural Orthostatic Tachycardia Syndrome ("POTS")

The primary symptom of POTS is lightheadedness and fainting. For patients who suffer from POTS, lightheadedness or fainting is accompanied by a sharp increase of more than 30 beats per minute, or a heart rate that exceeds 120 beats per minute within 10 minutes of rising from lying or sitting to a standing position. Dr. Diana Snyder saw Leslie at Mayo on November 14, 2019. (Dkt. 21-3 at 310-19) Dr. Snyder first noted POTS associated with a possible motility disorder due to Leslie's lightheadedness, syncope, and long-term constipation. (*Id.*) On January 30, 2020, Dr. Bergstrom diagnosed Leslie with POTS and

recognized symptoms including lightheadedness, low blood pressure, fatigue, musculoskeletal pain, and atrial flutter. (*Id.*)

### b.    Ehlers-Danlos Syndrome

On January 30, 2020, Dr. Bergstrom noted that Leslie likely met the criteria for Ehlers-Danlos Syndrome due to her hypermobility. (Dkt. 21-34 at 219-24) Dr. Bergstrom noted that hypermobility was associated with widespread musculoskeletal pain and fatigue, such as CFS/ME. On September 3, 2020, Leslie was seen at Mayo for a Nutrition Consultation to address poor oral intake related to POTS, Ehlers-Danlos Syndrome, and significant nausea (Dkt. 21-10 at 116-17) NP Graham has continued to document Leslie's POTS symptoms, including dizziness, fatigue, brain fog, forgetfulness, exercise intolerance, headaches, and insomnia (Dkt. 21-12 at 124-27, 128-31; 132-35, 136-39, 140-43; 144-47, 148-52, 153-56, 157-60, 162-67) Leslie's medical records contain numerous references to her multiple problems caused by autonomic dysfunction.

### c.    Nausea & Gastroparesis

Throughout her illness, Leslie has continually complained about nausea and problems with vomiting. Over the years since she stopped working, her weight has fluctuated dramatically to the point that she is very underweight. NP Graham noted that Leslie has an extremely low BMI and suffers from cyclic nausea. (Dkt. 21-2 at 3-4) Initial claim notes likewise document Leslie's nausea and vomiting. (Dkt. 21-1 at 19) Treatment notes from the Mayo dietitian recorded poor oral intake and significant nausea. (Dkt. 21-10 at 116-17)

As of November 14, 2019, Leslie reported nausea with vomiting 3-4 times per week. She experiences early satiety, bloating, and persistent reflux that Protonix has not helped. (Dkt. 21-3 at 310-19) Leslie reported difficulty keeping food down for 9-12 months when she was seen in the emergency room in January 2019. (Dkt. 21-4 at 97-107) An upper GI on January 26, 2019, was interpreted as chronic gastritis. (Dkt. 21-4 at 118-20) A subsequent upper GI on April 14, 2019, also documented chronic gastritis. In her January 22, 2021 OVN with NP Graham, Leslie reported feeling ill in the morning and having nausea and vomiting.

(Dkt. 21-3 at 654) On May 9, 2021, Leslie reported feeling sick if she ate in the morning. (Dkt. 21-3 at 647) Any bending or up-and-down movement of her head causes nausea. (Dkt. 21-3 at 648) The nausea improved when she lay down. (*Id.*) She reported remaining chronically nauseated on May 11, 2021. (Dkt. 21-3 at 653)

Leslie gained 50 pounds while taking Protonix, going from 114 to 157 pounds. (Dkt. 21-3 at 653) The earliest weight in the record shows 146.6 pounds in May 2019. Between November 22, 2019 and October 26, 2020, Leslie lost 18.8 pounds. (Dkt. 21-4 at 333, Dkt. 21-3 at 656) On May 11, 2021, Leslie weighed 103 pounds. (Dkt. 21-4 at 74) On January 22, 2021, NP Graham reported she was too thin, her weight was 111.6 pounds, and her BMI was 18.6, falling right between normal and underweight (Dkt. 21-3 at 640-44)

## III.   LFG's DECISION WAS ARBITRARY AND CAPRICIOUS

LFG's decision to discontinue benefits was unsupported by the totality of the record and should not be upheld. The record demonstrates that LFG's decision was impacted by its conflict of interest. Denial of a disability claim must result from a deliberate, principled reasoning process, free from significant conflict. *Glenn v. Metropolitan Life Ins. Co.,* 461 F.3d 660, 666 (6th Cir. 2006), *aff'd* 554 U.S. 105 (2008). The record in this case finds little, if any, of that kind of reasoning, but reflects that LFG and its reviewers cherry-picked or ignored critical evidence, and then mischaracterized and misrepresented the opinion of Leslie's primary treating provider to arrive at its predetermined outcome.

### A.   *The Standard of Review – Abuse of Discretion Tempered by Conflict of Interest*

Leslie does not dispute that the policy contains discretionary language. But a structural conflict exists in this case since her employer is the funding source and the payer of claims. *See Glenn,* 554 U.S. at 113; *Nolan v. Heald College,* 551 F.3d 1148, 1153 (9th Cir. 2009). A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim, or fails to credit a claimant's reliable evidence. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th

Cir. 2006). These, and other "case-specific factors," play into the conflict-of-interest analysis. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

A decision rendered without explanation or relying on clearly erroneous findings of fact is an abuse of discretion. *Day v. AT&G Disability Income Plan,* 698 F.3d 1091, 1096 (9th Cir. 2012). Under the abuse of discretion standard, a court must be left with a definite and firm conviction that a mistake has been committed. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). Thus, this Court evaluates whether the conclusion is (1) illogical, (2) implausible, or (3) without support in inferences drawn from the record. *Id.*

LFG operates under a conflict of interest because it determines eligibility and pays the claims. *Glenn*, 554 U.S. at 108. Review of its decisions is therefore "tempered by skepticism." *Harlick v. Blue Shield*, 686 F.3d 699, 707 (9th Cir. 2012). Conflict is always a factor to consider. *Abatie,* 458 F.3d at 968. An abuse of discretion must always consider the inherent even without 'smoking gun' evidence of conflict." *Id.* 458 F.3d at 968. There is no single set of factors that determine conflict, but they include cherry-picking records, failing to conduct an in-person medical examination, and failing to provide credit to records of a treating physician. *Glenn,* 554 U.S. at 116-119; *See Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d at 863, 868 (9th Cir. 2008); *Abatie,* 458 F.3d at 965. ERISA's Regulatory Scheme Demands a Full and Fair Review

LFG's decision was arbitrary and capricious because it disregarded the unequivocal opinions of Leslie's treating providers, without an acceptable explanation. Instead, LFG relies on the opinions of its paper reviewers to deny Leslie's claim, one of whom (Dr. Nowell) did not even speak to Leslie's treating provider during his review. (Dkt. 21-2 at 4) LFG has provided no basis whatsoever to reject the findings and conclusions of Leslie's treating providers, who consider her disabled. Notably, Leslie's treating providers continued to recommend further treatment and never once suggested that Leslie's pain was out of line or that she was malingering, as LFG's paper reviewers concluded. In addition, Leslie provided LFG with multiple sources of reliable medical information substantiating the fact that her

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ◆ (602) 266-2667

conditions were valid, that they caused the symptoms and problems she was experiencing, and that she remains disabled from performing any occupation. (Dkt. 21-12 at 66-87, 88-106, 107, 108-115, 116-123, 124-95) While LFG is not required to give greater weight to treating providers' opinions, it cannot "arbitrarily refuse to credit [Leslie's] reliable evidence," including opinions of treating providers. *Black & Decker Disability v. Nord,* 538 U.S. 822, 829 (2003).

### B.   Leslie is Disabled, and the Totality of Her Conditions Precludes Work in Any Capacity.

LFG's decision to cease Leslie's benefits is arbitrary and capricious because it failed to consider her conditions in totality, instead examining her diagnoses and symptoms piecemeal to justify LFG's predetermined outcome. Had the paper reviewers considered Leslie's whole condition, versus analyzing each condition separately, it should have come to a different conclusion.

Notably, LFG's only paper review before the initial denial was by Dr. Obadia, an internal medicine physician. (Dkt. 21-4 at 396-99) Dr. Obadia's evaluation consisted of a review of Leslie's primary diagnoses of CFS and hypermobility syndrome. (*Id.*) NP Graham repeatedly referenced Leslie's memory issues and the fact that she brings her significant other to appointments, who provided information to NP Graham when Leslie could not remember. (Dkt. 21-12 at 107) NP Graham also noted that Leslie reported significant post-exertional fatigue after physical activity. (*Id.*) Dr. Obadia disregarded that information, concluding that Leslie could work full-time with a few limitations, such as sitting over 50% of the time. This conclusion ignores the symptoms associated with many other diagnoses that Dr. Obadia found medical evidence to support, as well as the post-exertional fatigue after physical activity associated with CFS. (Dkt. 21-2 at 3-4)

Likewise, LFG's subsequent appeal reviewers, Dr. Ewald and Dr. Nowell, cherry-picked evidence in finding that Leslie can work full-time. (Dkt. 21-2 at 3-5) Dr. Ewald, who specializes in internal medicine and cardiovascular disease, acknowledged that Leslie

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

described a multitude of symptoms consistent with her CFS diagnosis, including chronic nausea, depression/anxiety, and possible mild dementia. (*Id.*) As part of his review, on February 7, 2023, Dr. Ewald consulted with NP Graham, Leslie's primary treating provider, who again opined that Leslie "did remain disabled for a variety of issues." (Dkt. 21-2 at 3) NP Graham noted that Leslie continued to struggle with chronic fatigue, limiting her ability to be physically active, and NP Graham stated she was "genuinely concerned" that Leslie had an underlying autoimmune or neurologic disease that had not yet been formally diagnosed. (Dkt. 21-12 at 107) NP Graham further noted Leslie's deliberate way of walking and previous neurological testing, which indicated that Leslie had mild dementia and no longer drives as a result. (*Id.*)

Dr. Ewald concluded, however, that because Leslie's physical exam and echocardiograms were "unremarkable," he was concerned that she was malingering. (Dkt. 21-2 at 3-5) "Malingering" is a psychological diagnosis that is outside Dr. Ewald's area of expertise. Dr. Ewald based this opinion on a 57-second video surveillance report, a review of her social media accounts reflecting her small jewelry business, and pictures taken during her honeymoon to the Bahamas in 2021. (*Id.*) Dr. Ewald's conclusory opinion did not, however, address the crux of Leslie's disability, which is that she cannot sustain work, not whether she can perform mild activity for short periods of time. Dr. Ewald specifically did not address Leslie's cognitive functioning, as he considered it outside of his expertise. (*Id.*)

Neuropsychologist Dr. Nowell also reviewed Leslie's appeal. (Dkt. 21-2 at 4-6) Based strictly on his paper review, Dr. Nowell concluded that the records did not document the escalation of behavior health issues from October 17, 2021 to the present. (*Id.*) That finding, however, should have had no bearing on LFG's decision, as Leslie's primary disability is CFS and resulting symptoms, not depression or mental health-related concerns.

LFG's recitation of Dr. Nowell's review demonstrates that, like Dr. Ewald, he cherry-picked information to support the predetermined outcome. Although Dr. Nowell acknowledged that Leslie's "records note consistent complaints of cognitive efficiency,

memory problems, and fatigue" (Dkt. 21-2 at 4), he focused almost solely on cherry-picked portions of Leslie's 2021 neuropsychological evaluation. Dr. Nowell conceded that Dr. Higgins' evaluation "noted that there were performances within the impaired range," along with poor performance on a non-verbal task, a high number of commission errors on the continuous performance task, and a higher reaction time than is typical. (*Id.*) Despite these documented deficiencies, and without even speaking to Leslie's neurologist, Dr. Nowell concluded that "[f]rom a neuropsychology perspective, the claimant can work full time full duty without restrictions" from October 17, 2021. (Dkt. 21-2 at 5)

Notably missing from LFG's consideration, either at the claim stage, in its initial denial, or on appeal, is whether and how Leslie's myriad of conditions, in totality, precluded her from performing full-time work in any occupation. Like her inability to work a full week, her post-exertional malaise and the other symptoms that keep CFS patients off work. LFG's review considered only whether Leslie could <u>perform</u> another occupation; it did not consider whether she could <u>sustain</u> this activity. Given Leslie's primary diagnosis of CFS and several other accompanying conditions, the reviewers' failure to consider this factor at the time of denial renders it arbitrary and capricious. *Salomaa,* 642 F.3d at 675 (finding the administrator's decision to deny benefits arbitrary and capricious, noting that a CFS diagnosis relies on subjective findings because "[t]here is no blood test or other objective laboratory test for CFS").

### C.   LFG's Paper Reviewers Concluded that Leslie's Evidence Conclusively Supports her CFS Diagnosis

LFG approved Leslie's claim by letter dated November 19, 2019 (Dkt. 21-10 at 303-07) It paid benefits through November 2021. (*Id.*) Dr. Mary Ellen Dirlam provided LFG with an initial paper review dated June 5, 2020. (*Id.*) Dr. Dirlam determined that the medical evidence in Leslie's file ***conclusively supports*** the diagnosis of CFS. (*Id.*) Additionally, Dr. Dirlam concluded that the medical records support that Leslie would not have the "stamina, stability, or strength to perform even sedentary work." Dr. Dirlam gave a subsequent paper

review dated November 5, 2020 (Dkt. 21-8 at 44-45) Once again, Dr. Dirlam determined that the medical evidence supported Leslie's diagnosis of CFS. (*Id.*) Dr. Dirlam reaffirmed that Leslie continued to be functionally impaired due to this diagnosis. (*Id.*) Dr. Dirlam's opinion essentially vaporized when LFG denied Leslie's claim.

Even Dr. Obadia acknowledged the validity of Leslie's CFS diagnosis in the single peer review report she provided LFG. (Dkt. 21-3 at 68-71) In that peer review report, Dr. Obadia determined that the medical evidence supported the diagnosis of CFS and many other diagnoses that Dr. Obadia found medical evidence to support. (*Id.*)

### D.    LFG's "Pure Paper" Review Blatantly Misrepresents the Opinion of Leslie's Treating Provider, NP Graham

Despite her determination that the medical evidence supported the diagnosis of CFS, after a brief phone call with NP Graham, Dr. Obadia concluded that Leslie was currently and permanently capable of full-time work activity. (Dkt. 21-4 at 396-99) In forming this opinion, however, Dr. Obadia blatantly misrepresented her conversation with NP Graham, further demonstrating LFG's arbitrary and capricious decision.

Adjuster Charles Martin contacted NP Graham, to discuss Leslie's condition. (*Id.*) In that conversation, Martin represented to NP Graham that their conversation was preliminary, and that LFG was gathering information but would wait until Leslie was seen by neurology for a definitive diagnosis and decision on disability. (Dkt. 21-12 at 107) Martin's documented take on the conversation was not consistent with NP Graham's.

> Dear Charles Martin,
>      This letter is in response to your premature conclusion of Leslie Marcus Long term disability claim.   My patient Leslie Marcus forwarded your letter for me to review.  Imagine my surprise when I read the "conclusion" you said I had made.
> Sadly, you outlined our conversation quiet differently than the information I presented to you. While this may be your practice to draw erroneous conclusion, I did make myself perfectly clear that Ms. Marcus is still being medically evaluated and no definitive diagnosis of disability had been made nor had any conclusion been drawn to preclude her from disability.
>      You reassured me, that our conversation was preliminary and you were gathering information and would be waiting until she was seen by neurology for a definitive diagnosis.  I am extremely disappointed that you made the assumption that I would not disable Ms. Marcus. We are still gathering information and evaluating her neurologic conditions. As a Family Nurse Practitioner diagnosis, a neurologic condition is best form a neurologist. Even Dr. Syal who is a neurologist wanted her to be evaluated by neurologist specializing in autonomic dysfunctions Her appointment is scheduled October 6th with Dr. Hatch.

*Id.*

-12-

Notwithstanding NP Graham's repudiation of Dr. Obadia's account of their conversation, this misrepresentation is central to LFG's claim denial. In the appeal determination, LFG then used this "preliminary" conversation between medical providers to claim that NP Graham believed that Leslie had no physical restrictions other than the reported memory loss and inability to lift a heavy weight above her head. (Dkt. 21-3 at 68-71) But, as NP Graham noted, this conclusion is taken out of context and misrepresents NP Graham's opinion that there was nothing to preclude Leslie from disability. (Dkt. 21-12 at 107)

Two of Leslie's treating providers, including NP Graham, later submitted declarations under the penalty of perjury reflecting their opinions, based on their ongoing treatment of Leslie, that Leslie is disabled. Dr. David Saperstein, who is a board-certified neurologist with an emphasis on treating autonomic disorders, verified that Leslie has POTS, Mast Cell Activation Syndrome ("MCAS"), and generalized hypermobility disorder. (Dkt. 21-3 at 59) He confirmed that, unlike LFG's paper reviewers, he had "performed extensive testing and evaluation of [Leslie]" and that he had reviewed the reports of LFG's paper reviewers. (*Id.*) In other words, like Dr. Nowell, Dr. Saperstein is a board-certified neurologist, yet his opinion is based on "extensive testing" of Leslie. In contrast, Dr. Nowell didn't even speak to Leslie's treating physicians before concluding that she was not disabled. There is no evidentiary or credibility-based explanation for this decision other than that LFG had a predetermined outcome.

NP Graham submitted a declaration under penalty of perjury, again refuting LFG's misrepresentation of her opinions and concluding that Leslie is, in fact, disabled. (Dkt. 21-3 at 81-82) In her declaration, NP Graham, who has treated Leslie since October 2020, reiterated her disagreement with Dr. Ewald's recollection of their discussion. (*Id.*) NP Graham noted that Leslie continues to meet the diagnostic criteria for CFS, and NP Graham maintained that Leslie was not "malingering" or "faking her illnesses." She noted that she had viewed videotape of Leslie having uncontrollable vomiting and neurological problems. NP Graham explained that for patients with CFS, "post-exertional malaise can result from even minor

-13-

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

physical or mental exertion" and that if Leslie were to work eight hours in one day, "that exertion would inevitably leave her unable to engage in activity the next day or several days." (*Id.*)

### E.    LFG Unjustifiably Disregards Leslie's Subjective Complaints

In denying Leslie benefits, LFG wrongly discredited Leslie's self-reported symptoms. As the Ninth Circuit has recognized, "Objective support for subjective complaints is not generally seen in CFS." *Salomaa*, 642 F.3d at 678; *see Laurie v. United of Omaha Life Ins. Co.*, No. 3:14-CV-01937-YY, 2017 WL 975947, at *17 (D. Or. Jan. 23, 2017), *report and recommendation adopted*, No. 3:14-CV-01937-YY, 2017 WL 970262 (D. Or. Mar. 13, 2017) Thus, "conditioning an award on the existence of [objective] evidence that cannot exist is arbitrary and capricious." *Salomaa*, 642 F.3d at 678. That is precisely what LFG has done here.

In his review, Dr. Ewald noted that Leslie described "a multitude of symptoms primarily revolving around chronic fatigue syndrome but also with intermittent chronic nausea, depression/anxiety, and possible mild dementia as evidenced by previous neuropsychologic testing, and therefore, some restrictions and limitations may be applicable for the timeframe in question." (Dkt. 21-2 at 4) Dr. Ewald then summarily dismisses Leslie's subjective complaints, noting that her physical exam and echocardiograms were unremarkable., (*Id.*) In justifying his dismissiveness, Dr. Ewald points to a 57-second video surveillance report and photos on Leslie's social media accounts, which Dr. Ewald believes is evidence of "secondary gain/malingering" or symptom magnification. (*Id.*)

Whereas it is LFG's right to seek objective evidence of a claimant's limitations, the Social Security paradigm that individual reactions to pain are subjective and are not easily determined by reference to objective measurements is applicable in the ERISA context. *Saffon v. Wells Fargo & Company Long Term Disability Plan,* 522 F.3d 863 872 (9th Cir. 2008) Likewise, "[w]hen a disability policy does not contain an exclusion for conditions based on subjective symptoms, such as CFS, the insurer "has taken on the risk of false claims

for th[ese] difficult to diagnose condition[s]." *Salomaa*, 642 F.3d at 678. Rejecting an application for benefits because a claimant failed to produce evidence of pain that cannot be produced can impact the deference the Court can give to the decision and the Court's determination as to the claimant's disability. (*Id.*) LFG cannot ignore Leslie's subjective pain complaints, even if not accompanied by the degree of objective evidence LFG would prefer.

This, alone, renders LFG's decision arbitrary and capricious. The Ninth Circuit has explicitly held that "[c]onditioning benefits on objective evidence when the claimant has a condition that does not have objective findings is arbitrary and capricious." *Salomaa*, 642 F.3d at 679. In *Salomaa*, the claimant suffered from CFS. The court found that the decision was an abuse of discretion because the plan (1) relied on internal file reviews rather than the records from the doctors who personally examined the claimant and (2) demanded "objective tests to establish the existence of a condition for which there are no objective tests." *Salomaa*, 642 F.3d at 676. The Court explained that because there is no objective laboratory test for CFS, instead, "[t]he standard diagnosis technique for [CFS] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history." *Id.*

LFG's decision should be different if LFG had truly credited Leslie's evidence of subjective complaints, rather than dismissing it as exaggerated based on a 57-second video and photos on social media. Across the board, Leslie's complaints and *objective* findings were consistent. She described her pain and fatigue consistently, and her reported and observed activity was not inconsistent with her symptoms. In the absence of evidence that Leslie's complaints or her treating physicians' opinions were not credible, LFG erred in dismissing this evidence.

Here, there was no analysis from LFG's paper reviewers to find Leslie or her treating providers to be untrustworthy. Dr. Obadia concluded Leslie was capable of a greater functional capacity than she reported on her claim forms and to her medical providers. (Dkt. 21-3 at 25-29; 20-24) Presumably, her conclusion is based on a single investigative report as

evidence of Leslie's greater functional capacity, yet her May 25, 2021 opinion only documents that Leslie goes to the doctor and is even driven by someone else (Dkt. 21-5 at 282-91. Through Leslie's social media, investigators only found that she takes photos of her dogs and surroundings outside. (Dkt. 21-5 at 294-306, Dkt. 21-3 at 13-17, 26-32, 35-36, 41-42, 21-5 at 359) Those photos are not inconsistent with Leslie's subjective complaints. The photos nearly always depict Leslie from a stationary position, or vantage point, considering she is rarely in the photo, and no videos or captions indicate she was partaking in any rigorous physical activity (Dkt. 21-5 at 319-26) When she is able, Leslie will ride on her husband's motorcycle.

Leslie established that her symptoms were consistent with his diagnosis and that they were "anatomically plausible." *See Palmer v. University Medical Group*, 994 F. Supp. 1221, 1233 (D. Or. 1998). Given the number of providers that Leslie has consulted to resolve her pain, if her complaints were so out of the realm of possibility, one of them would have mentioned it. Certainly, if NP Graham held that opinion, she would have been professionally obligated to disclose that to Dr. Obadia. Similarly, it is nonsensical that these providers would have risked losing their license by prescribing and or recommending narcotic pain medication without a valid medical reason.

### F. LFG's Failure to Conduct an IME Renders its Denial Arbitrary and Capricious

LFG's denial is arbitrary and capricious because it denied Leslie's benefits based on the opinions of its paper reviewers and failed to conduct an independent medical examination ("IME"). When evaluating the quantity and quality of medical evidence, courts often consider "whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records." *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 630 (9th Cir. 2009). One reason is that an insurance company may choose not to conduct an IME to avoid "the risk that the physicians it employs may conclude that the claimant is entitled to benefits." *Salomaa*, 642 F.3d at 676.

In other words, although ERISA does not strictly require a plan administrator to conduct an IME, a plan administrator "has a duty to conduct an adequate investigation of [a plaintiff's] claim before it denies benefits. *Id.* at 675 (citation omitted). In cases like CFS, where no objective test exists, a "failure to conduct an IME may raise questions about the thoroughness of the review and benefits determination." *Robertson v. Stand. Ins. Co.*, 139 F. Supp. 3d 1190 (D. Or. 2015), *order clarified*, No. 3:14-CV-01572-HZ, 2015 WL 13682034 (D. Or. Nov. 13, 2015). Failure to do an IME in a situation involving CFS has been held to be improper, particularly where the claimant's credibility is on the line due to a condition that does not lend itself to objective proof. *See Veronica L. v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1040 (D. Or. 2022), Here, it is undisputed that LFG failed to conduct an IME on Leslie, and in fact, one of LFG's paper reviewers, Dr. Nowell, did not even speak to Leslie's treating physician before deciding that Leslie was not disabled. This decision is clearly arbitrary and capricious. See *Veronica L.*, 647 F. Supp. 3d at 1041 ("An IME could have provided the evidence Defendant needed to determine whether Plaintiff is disabled from a physical condition, especially when Defendant expressed doubt as to Plaintiff's credibility and the extent of her subjective symptoms. Without such an examination, the Court finds that Defendant based its decision to deny ongoing benefits on inadequate evidence.").

### G.    *LFG's Transferable Skills Analysis Fails to Consider Leslie's Inability to Sustain Working*

Before her disability, Leslie worked for Balfour Beatty Investments as a Regional Property Manager. When LFG approved Leslie's benefits under the mental-nervous limitation, it terminated them based on its determination that she was not disabled under the any occupation disability definition. LFG agreed Leslie was disabled from her occupation when it paid all own occupation benefits due (Dkt. 21-3 at 1). Leslie's diagnoses and symptoms have not changed, and her restrictions and limitations have neither changed nor improved (Dkt. 21-3 at 632-34). The physical demands of Leslie's job are light. She can sit for less than two hours, stand for less than 5-10 minutes, and walk for less than one minute.

(*Id.*) She cannot bend or carry anything, and her short bursts of energy are followed by post-exertional malaise. (*Id.*)

LFG's August 12, 2021 denial letter lists three occupations it believes Leslie can perform. LFG classified her own occupation as light and determined she could perform it at the light level. This approach is arbitrary and capricious because, in part, LFG's vocational analysis accepts the physical limitations noted by peer reviewer, Dr. Obadia (Dkt. 21-3 at 20-23) These limitations, allegedly based on a conversation with NP Graham, follow:

- Lifting/carrying up to 10 pounds occasionally;
- Sitting over 50% of the time;
- Standing/walking occasionally;
- No lifting overhead; and
- To clarify, the claimant can sit over 50% of the time.

Dr. Obadia concluded Leslie was capable of a greater functional capacity than she reported on her claim forms and to her medical providers. (Dkt. 21-3 at 25-29, 20-23)

LFG's assessment contradicts the claim forms completed by Leslie on June 17, 2021(Dkt. 21-3 at 25-29) LFG asserts that Leslie is "currently and permanently capable of full-time work activity," given those restrictions. Yet, this conclusion undermines and ignores the very nature of CFS and its effects on her various other medical conditions (*Id.*) While Leslie might be able to lift 10 pounds occasionally or sit/stand in an office long enough to "perform" one of the three jobs LFG listed, her CFS leaves her too fatigued and exhausted to *sustain* the activity. In Dr. Obadia's phone call with NP Graham, NP Graham noted Leslie was limited by her cervical spine degenerative disc disease and that she experienced memory loss (Dkt. 21-3 at 68-71) NP Graham also noted that Leslie brings her significant other to appointments and that he provides information when Leslie is struggling with her memory (*Id.*) In addition to NP Graham's recognition of Leslie's memory loss, she provided a referral for neuropsychological testing. Neuropsychologist and licensed clinical psychologist Dr. Higgins completed a neuropsychological evaluation on November 15, 2021. Dr. Higgins

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

-18-

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

determined that Leslie has been experiencing increasing deficits in memory and cognitive function at a steeper rate of decline in the last few years (Dkt. 21-12 at 66-87) Dr. Higgins documented Leslie's experience and difficulty with the following:

- Remembering names;
- Misplacing items;
- Repeating herself and forgetting her own thought processes mid-sentence;
- Remembering what she read;
- Recalling recent and past events;
- Learning new information and even performing once-familiar tasks;
- Easily distracted and difficulty with concentration;
- Decreases in clarity of thinking and processing speed;
- Easily confused (unable to recall the date after waking up);
- Planning and organizing; and
- Sense of direction (forgets her intended destination and gets lost while driving).

Following Dr. Higgins's evaluation, Leslie was diagnosed with Memory Loss and Dementia without Behavioral Disturbance (*Id.*) On the Global Deterioration Scale, Leslie was placed at Stage 4 of 7 with her exhibiting moderate cognitive decline and a mild level of dementia (*Id.*)

Despite this objective evidence, however, LFG's vocational analysis relied only on Dr. Obadia's limitations and did not consider the limitations placed on her by her treating physician nor the limitations that would be imposed from her neuropsychological evaluation. When LFG reviewed her claim at the 24-month mental/nervous limitation and any occupation change in definition, it relied on Dr. Obadia's conclusions to determine Leslie was capable of sedentary work. LFG failed to consider the cognitive and mental demands of any of the alleged other occupations. The vocational analysis determined Leslie's transferrable skills as follows:

- Applying math skills to read and interpret business and statistical reports and records;
- Analyzing and interpreting administrative policy and procedure;
- Planning and organizing work of others;
- Making decisions based on business reports or similar data;

- Speaking and writing clearly;

- Preparing budgets, keeping records, inventory stock and dealing tactfully and

- courteously with the public, employees, or government officials; and

- Extensive knowledge of real estate practices and procedures.

(Dkt. 21-3 at 481-82)

Leslie's medical conditions render her unable to perform these transferable skills. LFG identifies three "occupations" that Leslie can perform: Title Search Manager, Employment Manager, and Sales Manager. (*Id.*) These occupations are all sedentary but require analytical thinking, managing others, communicating with customers and personnel, and the ability to do so consistently, which Leslie cannot do. This is reflected throughout the record, and LFG's refusal to consider any evidence that contradicts its position renders the denial arbitrary and capricious as a matter of law.

## IV.   CONCLUSION

ERISA demands that administrators operate in the best interest of its beneficiaries, that claimants get a full and fair review of any denied claim, and that decisions be free from conflict. LFG's decision fails to meet any of these requirements. Leslie requests that the Court find her entitled to benefits.

Dated this 28th day of April 2025.

SCHIFFMAN LAW OFFICE, P.C.


By: /s/ Lisa J. Counters
Counsel for Plaintiff