**Admitted Pro Hac Vice**
Iwana Rademaekers (TX Bar No. 16452560)
**LAW OFFICES OF IWANA RADEMAEKERS, P.C.**
17304 Preston Road, Suite 800
Dallas, Texas 75252
Main:  (214) 579-9319
Fax:  (469) 444-6456
Email:  iwana@rademaekerslaw.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie Marcus,<br><br>              Plaintiff,<br>       vs.<br><br>The Lincoln National Life Insurance Company,<br><br>              Defendant. | Case No. 2:24-cv-00228-ROS<br><br>**DEFENDANT'S RESPONSE BRIEF** |

Defendant The Lincoln National Life Insurance Company ("Lincoln") by and through its undersigned counsel, timely files this Response Brief pursuant to the Court's Order entered on March 10, 2025 (Document 24).  This Brief is supported by the attached *Declaration of Kayla Bick,* as well as the administrative record and relevant plan document that were filed with the Court as the *Joint Stipulated Record* (Document 21).[1]  All of these documents are fully incorporated into this Brief.

---

[1]   Exhibits A through C referenced throughout this Motion and Brief, refer to the Exhibits attached to the Joint Stipulated Record (Dkt 21), specifically, Ex. A at Dkt. 21-1, Ex. B at Dkt. 21-2, and Ex. C at Dkt. 21-3 through 21-13.

1

## I.    THE ADMINISTRATIVE RECORD AND RATIONALE FOR LINCOLN'S DECISIONS.

In her Original Complaint, Plaintiff Leslie Marcus ("Marcus") alleges that she is owed long-term disability benefits from Lincoln.  The benefits claimed by Marcus were part of the Balfour Beatty Investments, Inc. Long Term Disability Plan (the "LTD Plan"), an employee benefit plan, provided by her employer, Balfour Beatty Investments, Inc. ("Balfour Beatty"), under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA").  Therefore, this matter is governed by ERISA.  Additionally, Lincoln's predecessor, Liberty Life Assurance Company of Boston, issued Group Disability Income Policy Number GF3890-464263-01 (the "Policy") to Balfour Beatty, which insured certain benefits from the LTD Plan, including the benefits sought by Marcus from the LTD Plan.

Marcus was employed by Balfour Beatty as a "Regional Property Manager,"[2] and an Occupational Analysis requested by Lincoln found that the position was performed at the light duty level.[3]  Marcus submitted a claim for her absence from work as of April 13, 2019, and she received benefits from the Balfour Beatty Short Term Disability Plan through the maximum benefit date of October 16, 2019.[4]  Lincoln began processing Marcus' claim for benefits from the LTD Plan under the Policy and found Marcus eligible for these benefits starting October 17, 2019.[5]

---

[2]    See Job Description at Exhibit C, Joint Stipulated Record, Lincoln/Marcus 3896-3898 (Dkt 21-13, Pages 771-773).
[3]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 3283-3286 (Dkt 21-13, Pages 158-161).
[4]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 3901 (Dkt 21-13, Page 776).
[5]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 47; 3309 (Dkt 21-3, Page 1 and Dkt 21-13, Page 184).

As a Class 1 employee,[6] to receive benefits from the LTD Plan under the Policy for the initial 24-month period that ended October 16, 2021, Marcus had to be unable to perform the "Material and Substantial Duties of [her] Own Occupation."[7] Beyond October 16, 2021, Marcus had to be unable to perform the "Material and Substantial Duties of Any Occupation"[8] to continue to receive benefits, and Marcus was advised by Lincoln via letter dated March 3, 2021, of the upcoming change.[9]

Marcus was treated from May 4, 2019, through October 20, 2020, at the Mayo Clinic, which also conducted several tests that reflected normal or mild findings (mammogram, 12/18/19, negative;[10] CT Sinuses, 12/10/19, minimal postinflammatory changes in the paranasal sinuses;[11] tilt test, 12/12/19, orthostatic hypotension not detected;[12] upper endoscopy, 11/22/2019, normal esophagus, gastric body, antrum, and duodenum, 3cm hiatal hernia noted;[13] foot and ankle x-rays, 11/14/19, no fracture or dislocation;[14] CT neck, 11/14/19, few scattered benign-appearing subtly prominent lymph nodes, otherwise negative.[15] Various providers at Mayo listed numerous diagnoses in the records. However, there is no indication in the clinical records or other documents that any physician at Mayo stated that she had specific restrictions or limitations or that she could not work or perform job duties.[16]

---

6   Exhibit C, Joint Stipulated Record, Lincoln/Marcus 47 (Dkt 21-3, Page 1).
7   Exhibit A, Policy, Lincoln/Marcus 8 (Dkt 21-1, Page 8).
8   Exhibit A, Policy, Lincoln/Marcus 8 (Dkt 21-1, Page 8).
9   Exhibit C, Joint Stipulated Record, Lincoln/Marcus 2922 (Dkt 21-12, Page 80).
10  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1341 (Dkt 21-5, Page 96).
11  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1345 (Dkt 21-5, Page 100).
12  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1350 (Dkt 21-5, Page 105).
13  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1358 (Dkt 21-5, Page 113).
14  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1364 and 1365 (Dkt 21-5, Pages 119-120).
15  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1373 (Dkt 21-5, Page 128).
16  Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1229-1697 (Dkt 21-4, Pages 489-505 and Dkt 21-5, Pages 1-152).

3

Marcus also received treatment from Honor Health, including a 12/26/18 cryoablation.[17]    Notes from the clinic reflected a hospital admission with supraventricular tachycardia and atrial tachycardia on January 17, 2019.[18]    A transesophageal echocardiogram was conducted that same day that showed no mass or thrombus in the left atrial appendage.[19]    A 5/4/19 ECG reflected supraventricular tachycardia and atrial tachycardia.[20]

Marcus then followed up with Victor Abrich, M.D., who conducted a repeat ablation on June 12, 2019.[21]    An echocardiogram on June 12, 2019, reflected a normal heart for a 48-year old white female at rest and normal sinus rhythm without ectopy during the study.[22]    Pulmonary function tests on July 19, 2019 reflected a mild airway obstruction but corrected diffusing capacity was normal.[23]

A 4/1/20 Restrictions Form by Dr. Cibulka, M.D. stated Marcus was "forever" limited to sedentary work (lifting up to 10 pounds occasionally, sitting over 50% of the time and standing/walking occasionally)"[24]

Non-medical records, specifically an Instagram post,[25] indicated that Marcus had an active bead business, an "artist" Facebook page showing her bead creations,[26] and an Etsy shop that showed 354 listings on April 18, 2021,[27] and 307 listings on

---

[17]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1821 (Dkt 21-7, Page 15).
[18]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1864 (Dkt 21-7, Page 58).
[19]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1866 (Dkt 21-7, Page 60).
[20]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1682 (Dkt 21-5, Page 437).
[21]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 2379 (Dkt 21-10, Page 385).
[22]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 3444 (Dkt 21-13, Page 319).
[23]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1519 (Dkt 21-5, Page 274).
[24]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 3146 (Dkt 21-13, Page 21).
[25]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 2701-2721 (Dkt 21-11, Pages 239-259).
[26]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 2748 (Dkt 21-11, Page 286).
[27]    Exhibit C, Joint Stipulated Record, Lincoln/Marcus 2798 (Dkt 21-11, Page 336).

June 16, 2021.[28] A Facebook post dated April 17, 2020, showed a large table with many jewelry making supplies that she captioned, "Does everyone's house look like this?"[29] Her LinkedIn page stated that, effective August 2019 to Present, Marcus was "Taking a break from the real world."[30]

The Activities Questionnaire completed by Marcus on June 17, 2021,[31] stated that she has taken only one short trip via airplane in the past few years. With regard to hobbies, Marcus stated that her hands were too shaky to paint and she was too tired to do yoga, and too stressed for meditation.[32] She stated that she spends 2-3 hours on her home computer per week, only sending emails and using no software applications.[33] Marcus stated that she can sit for 5 hours per day (2 hours at a time), stand for more than 1 hour (5-10 minutes at a time), walk for more than 1 hour (1 minute at a time), and she lies down for 3+/- hours per day.[34] Marcus' statements regarding her computer use and her "shaky" hands are inconsistent with her operation of her home based jewelry business. Additionally, on June 16, 2021 (the day before Marcus completed this Activities Questionnaire), Marcus posted numerous photos on Facebook and stated that she had 10 days in "paradise," and had snorkeled, "experienced Thunderball Grotto, swam with pigs and sharks, navigated 2 ocean rivers, looked for buried treasure, were visited by barracuda, sting rays, sea turtles, and countless Conch and had an unplanned wedding. WOW."[35]

---

[28] Exhibit C, Joint Stipulated Record, Lincoln/Marcus 1224 (Dkt 21-4, Page 474).
[29] Exhibit C, Administrative Record, Lincoln/Marcus 2759 (Dkt 21-11, Page 297).
[30] Exhibit C, Administrative Record, Lincoln/Marcus 2769-2770 (Dkt 21-11, Pages 307-308).
[31] Exhibit C, Administrative Record, Lincoln/Marcus 1700-1702 (Dkt 21-5, Pages 455-457).
[32] Exhibit C, Administrative Record, Lincoln/Marcus 1702 (Dkt 21-5, Page 457).
[33] Exhibit C, Administrative Record, Lincoln/Marcus 1701 (Dkt 21-5, Page 456).
[34] Exhibit C, Administrative Record, Lincoln/Marcus 1700 (Dkt 21-5, Page 455).
[35] Exhibit C, Administrative Record, Lincoln/Marcus 1163 (Dkt 21-4, Page 423).

To assist in clarifying Marcus' medical functionality and associated restrictions and limitations, her claim was reviewed on July 21, 2021, by a consulting physician, Dr. Sharon J. Obadia, Board Certified in Internal Medicine, who concluded that Marcus is not precluded from full-time sedentary work activity.[36]  Dr. Obadia's report stated:

> "The medical records available for review and my telephone conversation with primary treating provider, nurse practitioner Tonia Graham, F.N.P. on 7/20/21 support the conclusion that the claimant is currently and permanently capable of full-time work activity with the following restrictions/limitations:
>
> - Lifting/carrying up to 10 pounds occasionally
> - Sitting over 50% of the time
> - Standing/walking occasionally
> - No lifting overhead
>
> These restrictions/limitations are reasonably supported based on the consistently documented primary diagnoses of myalgic encephalitis/chronic fatigue syndrome (R53.82) and hypermobility/Ehlers-Danlos syndrome (M35.7) with related fatigue and autonomic dysfunction and conclusions based on my conversation with Ms. Graham. During our conversation, Ms. Graham and I discussed the claimant's primary diagnoses of myalgic encephalitis/chronic fatigue syndrome and hypermobility syndrome. I inquired as to whether Ms. Graham has placed current restrictions and/or limitations on the claimant's physical activity. Ms. Graham explained that she has not recommended to the claimant that she limit physical activity, but the claimant has reported to Ms. Graham that she has a lot of post-exertional fatigue after physical activity. I inquired as to whether Ms. Graham feels the claimant is capable of a sedentary job and Ms. Graham explained that she feels sedentary work would be great for the claimant. Ms. Graham explained that the claimant has recently reported short-term memory issues to her, and Ms. Graham has referred the claimant to a neurologist for this. Ms. Graham explained that the neurology consult is pending at this time. I asked Ms. Graham if she has noted any abnormal findings on physical examination related to memory loss. Ms. Graham explained that she has not, but she has noticed that the claimant brings her significant other to her appointments and he

---

[36]   Exhibit C, Administrative Record, Lincoln/Marcus 1136-1139, specifically 1139 (Dkt 21-4, Pages 396-399, specifically Page 399).

provides information to Ms. Graham if the claimant is unable to remember the information. At the conclusion of our conversation, Ms. Graham confirmed that she feels the claimant has no physical restrictions other than the reported memory loss and the inability to lift heavy weight above her head due to her cervical spine degenerative disc disease. The medical records available for review and my conversation with Ms. Graham support the conclusion that the claimant is currently and permanently not precluded from full-time sedentary work activity. The medical records available for review do not support restrictions or limitations based on claimant reported recent short-term memory loss."[37]

A letter was sent to Ms. Graham on July 25, 2021, to confirm the conversation and give her the opportunity to make any corrections or comments.[38] However, no response was received from Ms. Graham at that time.

Additionally, Marcus' file was referred to a Vocational Specialist to conduct a transferable skills analysis of Marcus' current capabilities, training, education, and experience, which identified occupations that were within Marcus' physical abilities and identified skills level.[39] Specifically, the sedentary occupations of Manager, Title Search; Manager, Employment; and Manager, Sales, with national monthly wages between $9,696.27 and $11,024.00 were identified by the Vocational Specialist.[40]

Based on the medical records from her treatment providers, the consulting physician review, and the vocational analysis, Lincoln determined that Marcus would not be eligible for benefits beyond October 16, 2021, when the Policy definition of "Disabled" required disability from "any occupation. The basis of the denial of further benefits was explained in Lincoln's letter dated August 12, 2021,[41] in which Marcus

---

[37] Exhibit C, Administrative Record, Lincoln/Marcus 1136-1139, specifically 1138-1139 (Dkt 21-4, Pages 396-399, specifically Page 398-399).
[38] Exhibit C, Administrative Record, Lincoln/Marcus 1142 (Dkt 21-4, Page 402).
[39] Exhibit C, Administrative Record, Lincoln/Marcus 1078-1081 (Dkt 21-4, Pages 338-341).
[40] Exhibit C, Administrative Record, Lincoln/Marcus 1079 (Dkt 21-4, Page 339).
[41] Exhibit C, Administrative Record, Lincoln/Marcus 1083-1087 (Dkt 21-4, Pages 343-347).

was provided with an opportunity to request a review of the denial of further benefits and submit additional information in support of her claim.

After issuing its letter, Lincoln received a faxed letter from Ms. Graham on September 3, 2021, stating that in her discussion with Dr. Obadia, she had told her that Marcus was still being evaluated and additional information was being gathered from a neurologist and neuropsychologist.[42]  Ms. Graham did not recant her statement that sedentary work would be beneficial to Marcus.

On September 16, 2021, Marcus' counsel wrote to Lincoln and requested records.  Through her counsel, Marcus submitted an appeal on January 27, 2023, along with a 11/15/21 neuropsychological evaluation and additional clinical notes.[43]  The notes from the neuropsychological testing stated that Marcus was "quick to grasp tasks and fast performance throughout."[44]  This comment was made in contrast to Marcus' self-report in connection with the testing that she had "difficulty completing simple tasks, verbal communication difficult."[45]

In order to conduct a fair and thorough review, Lincoln requested an independent peer review, which was conducted by Eric J. Ewald, M.D., who is Board Certified in Cardiovascular Disease and Internal Medicine.[46]  Dr. Ewald stated that:

> All provided medical and non-medical documentation has been reviewed from the perspective of Internal Medicine. The claimant DOB: 5/27/1971) is a female with a history of atrial flutter status post ablation in 12/18 and repeat ablation in 2019 with normal LV (left ventricular) and valvular function on multiple echocardiogram studies. The patient also had a DVT (deep vein thrombosis) and small PE (pulmonary

.
[42]    Exhibit C, Administrative Record, Lincoln/Marcus 1051 (Dkt 21-4, Page 311).
[43]    Exhibit C, Administrative Record, Lincoln/Marcus 852-993 (Dkt 21-4, Pages 112-253).
[44]    Exhibit C, Administrative Record, Lincoln/Marcus 1038 (Dkt 21-4, Page 298).
[45]    Exhibit C, Administrative Record, Lincoln/Marcus 1036 (Dkt 21-4, Page 296).
[46]    Exhibit C, Administrative Record, Lincoln/Marcus 681-692 (Dkt 21-3, Pages 625-684).

embolism), for which she was treated with anticoagulation. However, the active issues over the last several years appear to be concern surrounding chronic fatigue syndrome/myalgic encephalomyelitis. Additionally, she has had difficulty with depression, anxiety, difficulty with insomnia, and chronic nausea. She also appears to have some difficulty with possible dysautonomia and POTS (postural orthostatic tachycardia syndrome) although reportedly had a negative tilt table test as well as a negative EMG (electromyogram)and nerve conduction study in 2020. The patient reportedly struggles with insomnia and daily symptomatic/severe fatigue limiting her ability to be physically active in any capacity. She also had a neuropsychological testing in 2021, which was felt to show a mild level of dementia. She has seen a multitude of physicians over the years and had a significant amount of testing performed including blood work, which did not show any significant/severe abnormality. A surveillance report from May 2021 described the claimant as ambulating without obvious restrictions or abnormality during a reported video clip of 57 seconds. There has also been an investigative report into her social media which revealed pictures showing her sitting on a log in the middle of a forest from 2020, and documentation of a trip to the Bahamas in 2021, at which time, she was married and various pictures show her standing on a beach, lying in the water, standing in waist deep water, and sitting/kneeling on cushions in some type of motor boat.[47]

Dr. Ewald further concluded:

Based on the medical file review, the claimant described a multitude of symptoms primarily revolving around chronic fatigue syndrome but also with intermittent chronic nausea, depression/anxiety, and possible mild dementia as evidenced by previous neuropsychological testing, and therefore, some restrictions and limitations may be applicable for the timeframe in question. However, her physical exam and echocardiograms are unremarkable and I do remain concerned that there may be a component of secondary gain/malingering, or at least symptom magnification based on the video surveillance report submitted reportedly showing her for 57 seconds ambulating without difficulty entering and exiting the passenger side of a automobile without any obvious gait abnormality, difficulty with locomotion, difficulty with opening or closing a car door, or need for an assist device. Additionally, an investigative report regarding her social media was submitted and reviewed describes her possibly having a home business, where she sells and makes jewelry (items requiring beads stringing such as bracelets/necklaces/pendants etc.), and multiple

---

[47] Exhibit C, Administrative Record, Lincoln/Marcus 681-692, specifically 685 (21-3, Pages 625-684, specifically Page 629).

pictures during a Bahama trip in '21 showing her standing in the water on the beach, lying on the beach, or kneeling on cushions in a motor boat.[48]

Therefore after reviewing above voluminous records submitted that only certain restrictions/limitations would be reasonable and expected due to chronic fatigue syndrome. While specific treatment for this syndrome is somewhat unclear at this time in medical practice, it is recognized that attempting to maintain daily routine activity in an increasing fashion with the hopes of increasing stamina is the goal. which in turn may potentially translate into more fitful nocturnal sleeping. I would not comment specifically on cognitive functioning, as it outside of my field of expertise, but do recognize that previous neuropsychological testing revealed mild dementia and this could present additional restrictions and limitations, but this should be addressed by a board certified neurologist or possibly psychiatrist. [49]

Dr. Ewald, identified the following restrictions:  stand/walk/sit/use hands for fine manipulation - as tolerated by the patient in an 8 hour[50] workday due to chronic fatigue; push/pull/carry/lift-up to 15 pounds occasionally; bend/stoop/kneel/climb stairs/reach - as tolerated.[51]

Lincoln also requested an independent peer review by a neuropsychologist, which was conducted by David Nowell, Ph.D., an independent neuropsychologist who concluded that, "from a Neuropsychology perspective, the claimant is able to work full time full duty without restrictions."[52]  With regard to the neuropsychological testing submitted by Marcus' counsel, Dr. Nowell stated:

A September 2021 neuropsychological evaluation noted there were performances within the impaired range, although the report following that evaluation did not review raw scores or standard scores or percentile

---

[48]  Exhibit C, Administrative Record, Lincoln/Marcus 681-692, specifically 690-691 (21-3, Pages 625-684, specifically Pages 634-635).

[49]  Exhibit C, Administrative Record, Lincoln/Marcus 681-692, specifically 691 (21-3, Pages 625-684, specifically Page 635).

[50]  Exhibit C, Administrative Record, Lincoln/Marcus 641 (modified to correct error in original report that read "4 hours.") (Dkt 21-3, Page 585).

[51]  Exhibit C, Administrative Record, Lincoln/Marcus 691 (Dkt 21-3, Page 635).

[52]  Exhibit C, Administrative Record, Lincoln/Marcus 667-678, specifically 677 (Dkt 21-3, Pages 611-622, specifically Page 621).

ranks on all tests administered. The report did include an addendum which allowed for review of some of the tests administered at that exam. Poor performance was noted on a non-verbal recall task, with adequate performance on a list learning task. Performance across index scores on IQ battery fell within normal limits, including scales tapping into working memory and processing speed. Variable performances were noted across indicators on the continuous performance task, with a high number of commission errors and with slightly higher reaction time than is typical. Variable performance is reflected in the report following September 2021; there was insufficient information provided in that report to determine whether there were consistent findings of memory impairment, or consistent findings of attentional impairment. The records indicate there were performance validity indicators included as part of that assessment. These performances were not specifically reviewed in the report or appendix. It is not possible for an independent reviewer to form impression on the basis of these data alone, and review of the total record does not yield a consistent picture of abnormal exam findings or clinician-observed cognitive dysfunction.[53]

In connection with his review, Dr. Nowell attempted to confer with the neuropsychologist who performed Marcus' neuropsychological evaluation, Dane Higgins, Ph.D., leaving messages on two different days, but the messages were never returned.[54]

Lincoln also requested an updated transferable skills analysis[55] to assess whether the previously identified occupations remain viable with the updated restrictions and limitations that were recommended in the new peer review completed by Dr. Ewald. The updated transferable skills analysis confirmed that the previously-identified sedentary occupations remained within Marcus' restrictions, abilities, and skill level.[56]

---

[53] Exhibit C, Administrative Record, Lincoln/Marcus 675-676 (Dkt 21-3, Pages 619-620).
[54] Exhibit C, Administrative Record, Lincoln/Marcus 671 (Dkt 21-3, Page 615).
[55] Exhibit C, Administrative Record, Lincoln/Marcus 635-636 (Dkt 21-3, Pages 579-580).
[56] Exhibit C, Administrative Record, Lincoln/Marcus 635-636 (Dkt 21-3, Pages 579-580).

The peer reviews and updated vocational report were sent to Marcus' counsel on March 27, 2023, for review and comment.[57]  Marcus' counsel submitted additional medical records,[58] along with a 5/12/23 physical capabilities evaluation by Dr. Cibulka, which stated Marcus could only sit for 3 hours, stand for 30 minutes, and walk for 15 minutes of an 8-hour day and could never lift or carry.[59]

Upon receipt of this additional documentation from Plaintiff's counsel, Marcus' file was referred for addendum reviews by Dr. Ewald and Dr. Nowell.  In Dr. Ewald's addendum report, he stated that the additional records did not change his opinion regarding Marcus' restrictions and limitations and that such tasks would be therapeutic in terms of improving conditioning/stamina, consistent with Dr. Saperstein's comments about the benefits of physical therapy.[60]  Specifically, he stated that the essential records revealed essentially unremarkable autonomic testing and brain MRI. Dr. Ewald did note that the cervical MRI reflected some degenerative cervical multilevel disc disease, but those findings were not unusual based on Marcus' age. Dr. Ewald stated that he remained concerned that Marcus showed a "component of somaticizing from depression/anxiety or that behaviors/symptoms were due to secondary gain or symptom magnification.[61]  Likewise, Dr. Nowell's addendum stated that these additional records did not change his opinion, as no test results or exam findings or other clinician-observed signs of cognitive impairment were referenced.[62]

---

[57]  Exhibit C, Administrative Record, Lincoln/Marcus 495-496 (Dkt 21-3, Pages 439-440).
[58]  Exhibit C, Administrative Record, Lincoln/Marcus 378-475 (Dkt 21-3, Pages 322-419).
[59]  Exhibit C, Administrative Record, Lincoln/Marcus 384-385 (Dkt 21-3, Pages 328-329).
[60]  Exhibit C, Administrative Record, Lincoln/Marcus 358-361 (Dkt 21-3, Pages 302-305).
[61]  Exhibit C, Administrative Record, Lincoln/Marcus 360 (Dkt 21-3, Page 304).
[62]  Exhibit C, Administrative Record, Lincoln/Marcus 349 (Dkt 21-3, Page 293).

Lincoln sent these addendums to Plaintiff's counsel on June 12, 2023, for review and comment.[63]    Plaintiff's counsel submitted additional documentation to Lincoln, including a declaration from a new treating physician dated September 27, 2023.[64]    Lincoln requested that Dr. Ewald review the new documentation and prepare an addendum report.    Dr. Ewald's addendum stated that his opinion regarding Marcus' restrictions and limitations remained unchanged, and he had considered all of the assigned diagnoses (POTS, mast cell activation syndrome, chronic fatigue syndrome, generalized hypermobility spectrum disorder, and mild dementia).    However, Dr. Ewald stated that "it is both reasonable and expected that she would be capable of continuing to work full-time with some minor restrictions based on her multitude of symptoms and diagnoses.[65]    Lincoln then mailed this addendum to Marcus' counsel on October 9, 2023, and provided yet another opportunity to review and respond with any additional information that Plaintiff would like considered before a final determination was made on the appeal.[66]    However, no response was received from Marcus' counsel.

On November 3, 2023, Lincoln issued its letter upholding its decision to end Marcus' benefits on October 16, 2021, as proof of Marcus continued eligibility for benefits upon the Policy change in the definition of "Disabled" effective October 17, 2021, had not been provided, and therefore, no further benefits are payable.[67]    Lincoln found that, based on a review of all of the medical documentation contained in the LTD disability claim file, the available information did not contain sufficient exam findings, diagnostic test results, or other forms of medical documentation

---

[63]    Exhibit C, Administrative Record, Lincoln/Marcus 344 (Dkt 21-3, Page 288).
[64]    Exhibit C, Administrative Record, Lincoln/Marcus 115 (Dkt 21-3, Page 59).
[65]    Exhibit C, Administrative Record, Lincoln/Marcus 108 (Dkt 21-3, Page 52).
[66]    Exhibit C, Administrative Record, Lincoln/Marcus 105 (Dkt 21-3, Page 49).
[67]    Exhibit B, Appeal Decision Letter Dated November 3, 2023, Lincoln/Marcus 89-98 (Dkt 21-2, Pages 1-10).

substantiating that Marcus' symptoms and impairments were of such severity, frequency, and duration that they resulted in restrictions or limitations rendering her unable to perform the duties of the occupations identified as being within her functional capacity and vocational skills as of October 17, 2021.[68]

## II.    STANDARD OF REVIEW – ARBITRARY AND CAPRICIOUS

Marcus does not dispute that the Policy contains discretionary language,[69] and Lincoln agrees with Marcus that there is a structural conflict because Lincoln is the claim administrator of claims that are paid from the LTD Plan under the Policy. However, this structural conflict is the sole source of Lincoln's alleged conflict of interest in this action.  Additionally, there is evidence before the Court that Lincoln took affirmative steps to separate its underwriting and claims functions and to ensure accuracy in its claim process.[70]  Lincoln has specifically taken "active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117–18 (2008).  Therefore, the conflict will "prove less important (perhaps to the vanishing point)" due to these steps taken by Lincoln. *Id*. at 117.

## III.    LINCOLN'S DECISION WAS NOT ARBITRARY AND CAPRICIOUS

It is abundantly clear that Lincoln did not abuse its discretion in denying Marcus' benefits from the LTD Plan.  The administrative record concerning Marcus' claim for disability benefits that was reviewed by Lincoln does not contain sufficient documentation to support a finding that Marcus was disabled, as defined by the Policy,

---

[68]    Exhibit B, Appeal Decision Letter Dated November 3, 2023, Lincoln/Marcus 95 (Dkt 21-2, Page 7).
[69]    The Policy specifically states, "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder."  Exhibit A, Policy, Lincoln/Marcus 40 (Dkt 21-1, Page 40).
[70]    Declaration of Kayla Bick, at ¶¶ 4-8.

beyond October 16, 2021.  Lincoln, as well as Dr. Obadia, Dr. Ewald, and Dr. Nowell all discussed Marcus' diagnoses, symptoms, testing, self-reported complaints, and treatment by her treating medical providers in great detail.  Lincoln and these physicians also acknowledged Marcus' self-reported symptoms and that Marcus' diagnoses resulted in substantial restrictions and limitations.  However, when it came to the ultimate decision regarding whether Marcus was able to work at "any occupation," under the Policy definition of "Disabled" that applied from October 17, 2021, onward, Lincoln found that Marcus did not meet the definition of "Disabled" in the Policy.  This was not a decision that was made lightly – Lincoln obtained numerous sets of records from Marcus' providers and consulted with medical and neuropsychological specialists, repeatedly.  Moreover, Lincoln engaged in dialogue with Marcus' counsel about the claim and the medical records, providing numerous opportunities to review and respond to the various peer reviews that it obtained.

Marcus' primary argument in her brief is that Lincoln and the physicians should have followed the opinions of Marcus' providers.  However, Lincoln's decision is supported by ample evidence, including records received from Marcus' treating medical providers, independent peer reviews, and reports of medical imaging studies.  That Lincoln ultimately accepted the opinions of Dr. Obadia, Dr. Ewald, and Dr. Nowell, rather than those of Marcus' treating providers, is not sufficient to show bias and is an appropriate use of the discretion granted to Lincoln.  *Gunn v. Reliance Std. Life Ins. Co.*, 399 Fed. App'x. 147, 155-156 (9th Cir. 2010).  Moreover, many of the treating providers' opinions regarding Marcus' restrictions and limitations were

issued months and even years after the date that is relevant to Marcus' claim for recovery of benefits in this action – October 17, 2021.

Lincoln's decision to terminate benefits under the "any occupation" definition of "Disabled" that applied on and after that date was grounded on a reasonable factual basis for concluding that Marcus' restrictions and limitations, as found by Dr. Obadia, Dr. Ewald, and Dr. Nowell, did not prevent her from working in the sedentary occupations identified in the vocational analysis. Moreover, there is ample non-medical documentation in the administrative record regarding Marcus' ability to enjoy an extended and active beach vacation and create inventory for and operate a substantial jewelry business. Those activities cast doubt on Marcus' self-reported lack of functionality that were made close in time to these activities and the October 17, 2021, determination date.

Lincoln clearly explained the reasons for its decision in its letters of August 12, 2021, and November 3, 2023, and demonstrated that it considered the evidence presented by Marcus. Lincoln had discretion to weigh the conflicting evidence and did not abuse that discretion in terminating Marcus' benefits. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831-34, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).

Moreover, Marcus does not assert that Lincoln committed procedural violations or failed to provide a full and fair review of Marcus' claim. Marcus faults Lincoln for not conducting an independent medical examination ("IME"). However, Marcus' counsel did not submit an appeal of Lincoln's August 12, 2021, decision to terminate benefits on October 17, 2021, until almost 17 months later – on January 3, 2023. By that time, an IME would not have been useful in determining Marcus' condition as of

the date of the benefit termination, and such an IME would not have provided an accurate impression of Marcus' restrictions and limitations on the relevant date of October 17, 2021.

As Judge Beth Labson Freeman stated in *Beach v. Liberty Life Assur. Co.*, Case No. 15-cv-04737 at 13-14 (N.D. Cal. June 28, 2017) (copy attached),

> "The language of the any occupation standard is not demanding." *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1219 (9th Cir. 2008) (citation and internal quotation marks omitted). "It requires only that [Plaintiff] be able to perform a job for which [s]he is qualified or for which [s]he can reasonably become qualified by training, education or experience." *McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d 1310, 1317 (9th Cir. 1994), overruled on other grounds by *Inciong v. Fort Dearborn Life Ins. Co.*, 570 Fed. Appx. 724 (9th Cir. 2014). Specifically, Plaintiff must prove that she is unable to perform any job consistent with her training, education, or experience without consideration of her pre-disability salary. *Pannebecker*, 542 F.3d at 1220; *Haber v. Reliance Std. Life Ins. Co.*, No. CV 14-9566, 2016 WL 4154917, at *7 (C.D. Cal. Aug. 4, 2016).
>
> Still more difficult to establish, Plaintiff bears the burden of proving she is unable to perform any part-time work in order to recover under the "any occupation" standard. *Shane v. Albertson's Inc. Emps.' Disability Plan*, 381 F. Supp. 2d 1196, 1206 (C.D. Cal. 2005); *Graeber v. Hewlett Packard Co. Emp. Benefits Org. Income Prot. Plan*, 421 F. Supp. 2d 1246, 1254 (N.D. Cal. 2006). The *Graeber* court considered this issue and concluded that a claimant capable of working 20 hours per week is not unable to work in "any occupation" and thus not entitled to disability benefits beyond the "own occupation" benefit. *Graeber*, 421 F. Supp. 2d at 1254–55. In construing nearly identical language to the language at issue here, the court reasoned that language requiring a claimant to be unable to work at any occupation meant that a claimant "must not be able to work at all, not even part time." Id. at 1254. *Graeber* expressly rejected the argument that disability eligibility turned on the ability to perform full-time work: "The Court rejects plaintiff's assertion that a Plan Member is entitled to long-term disability benefits unless [s]he can work full time in any occupation. Plaintiff's argument is belied by the plain meaning of the 'any occupation' standard and the case law." Id. at 1256. Similarly, in *Shane*, the court found, on de novo review, that a claimant capable of performing part-time work was ineligible for "any occupation" benefits. 381 F. Supp. 2d at 1206.

In upholding Judge Freeman's decision, the Ninth Circuit stated that a claimant's ability to sustain at least part-time work (as demonstrated here by Marcus' operation of the jewelry business and comments made by her treating medical providers) was evidence to support a determination that a claimant retained the ability to sustain employment. *Beach v. Liberty Life Assur. Co.*, 763 Fed. Appx. 601, 2019 U.S. App. LEXIS 7817 (9th Cir. 2019).

In sum, the administrative record establishes that the decisions made by Lincoln on Marcus' claim were not only not an abuse of discretion, but were, in fact, the correct decisions based on the administrative record. Accordingly, Marcus should not prevail on her claim for recovery of benefits pursuant to 29 U.S.C. §1132(a)(1)(B), and the Court should dismiss Marcus' claim for recovery of benefits from Lincoln.

## IV.    BENEFIT CALCULATION

If the Court does decide that Lincoln's decision was arbitrary and capricious and awards benefits to Plaintiff, the benefits that would be paid from October 17, 2021, forward would be subject to the Policy's requirement that "Other Income Benefits and Other Income Earnings"[71] must be offset against the monthly gross benefit.[72] The administrative record does not contain a Notice of Award issued by the Social Security Administration pertaining to a claim by Marcus for Social Security Disability Income. Moreover, the administrative record does not contain documentation regarding the income Marcus has received from her jewelry business. Accordingly, the calculation

---

[71] Exhibit A, Policy, Lincoln/Marcus 29-30 (Dkt 21-1, Pages 29-30).
[72] Exhibit A, Policy, Lincoln/Marcus 20 (Dkt 21-1, Page 20).

of Marcus' benefit owed, if any, will require Marcus to provide information and documents that are "needed to determine . . . the actual benefit amount due."[73]

## V.    CONCLUSION AND PRAYER

Summary judgment in favor of Lincoln is appropriate as a matter of law. Lincoln did not abuse its discretion in denying Marcus further benefits from the LTD Plan based on the administrative record.    Therefore, Lincoln requests that the Court enter a take-nothing judgment on Marcus' claims in this action, award Lincoln its attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and grant Lincoln any other relief to which it shows itself justly entitled.

RESPECTFULLY SUBMITTED this 2nd day of June 2025.

LAW OFFICES OF IWANA RADEMAEKERS, P.C.

By:    /s/ Iwana Rademaekers
Iwana Rademaekers
Attorney for Defendant The Lincoln
National Life Insurance Company

---

[73] Exhibit A, Policy, Lincoln/Marcus 32 (Dkt 21-1, Page 32).This Policy provision also states that the failure of a "Covered Person" to provide such information will result in the discontinuation of the long term disability benefit.

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2025, I electronically transmitted this document to the Clerk's Office using the CM/ECF System for filing, and the electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means, as follows:

Lisa J. Counters
Lisa@Schiffmanlaw.com
*Attorneys for Plaintiff*

/s/ Sandy Acker
Employee of the Law Offices of
Iwana Rademaekers, P.C.