# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

SUSAN BEACH,

        Plaintiff,

        v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, INC.,

        Defendant.

Case No. 15-cv-04737-BLF

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT UNDER RULE 52; ISSUING FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER RULE 52; AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT UNDER RULE 52**

[Re: ECF 29, 44]

Plaintiff Susan Beach worked as a Chef/Food Services Supervisor at Leland Stanford Junior University ("Stanford") from 1996 through April 2014, when Stanford eliminated her position. Thereafter, she filed a claim for long-term disability under the terms of Leland Stanford Junior University Group Long Term Disability Plan (the "Plan"),[1] an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. As the administrator of the Plan, Defendant Liberty Life Assurance Company of Boston ("Liberty"), denied Beach's claim for long-term disability. CF 53–58, 1181–85.

The parties have filed cross motions for judgment pursuant to Federal Rule of Civil Procedure 52. Beach seeks a determination that the decision to deny her long-term benefits was incorrect and that she qualifies for benefits under the "any occupation" provision of the Plan. She also seeks a payment of benefits. The Court set a "Hearing on Dispositive Motions/Bench Trial" for June 9, 2017, and heard extensive oral argument on that date.[2] For the reasons discussed

---

[1] Stanford also provides short-term disability benefits under the Leland Stanford Junior University Voluntary Disability Insurance Plan (the "VDI Plan"), which is a separate self-funded plan established and maintained by Stanford. McGee Decl. ISO Def.'s Mot. ("McGee Decl.") ¶ 5, ECF 29-2. In addition to her claim for long-term disability, which is at issue in the present action, Ms. Beach also filed a claim for short-term disability, which was approved and paid out. CF 43.

[2] For ease of reference, the Court refers to the June 9, 2017 proceeding as "the bench trial."

below, the Court GRANTS Liberty's Rule 52 motion, issues Findings of Fact and Conclusions of Law under Rule 52, and DENIES Beach's motion.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 52 provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff is [entitled to benefits] under the policy." *Prado v. Allied Domecq Spirits & Wine Grp. Disability Income Policy*, 800 F. Supp. 2d 1077, 1094 (N.D. Cal. 2011) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). In making that determination, the court must "evaluate the persuasiveness of conflicting testimony and decide which is more likely true," in order to make findings of fact that will be subject to review under a clearly erroneous standard if appealed. *Kearney*, 175 F.3d at 1095.

The parties agree that Liberty's claim determination is subject to *de novo* review. Def.'s Mot. 17, ECF 29; Pl.'s Mot. 4, ECF 44. Under the *de novo* standard of review, Beach bears the burden of showing, by a preponderance of the evidence, that she was disabled under the terms of the Plan, without according deference to Liberty's denial of claim. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006); *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011); *Kearney*, 175 F.3d at 1087–90. To prevail, Beach needs to prove it is "more likely than not" that she was disabled under the terms of the Leland Stanford Junior University Group Long Term Disability Plan. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016) (standard of proof in de novo ERISA disability claim is preponderance of the evidence); *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir. 1996) (defining "preponderance of the evidence" as "more likely than not").

## II.    FINDINGS OF FACT

### A.    Ms. Beach's Occupation

Prior to being laid off in April 2014, Beach was a Chef/Food Services Supervisor at Stanford in Palo Alto, California, where she had been working since 1996. CF 1, 60, 1540. Ms.

2

Beach was terminated because Stanford decided to close its kitchen in a planned restructure towards using a catering company for its faculty lunches. CF 2219. Ms. Beach was informed of this plan in September 2013. *Id.*

As a Chef/Food Services Supervisor, Ms. Beach was responsible for "the planning and coordination of high quality nutritious, delicious, attractive and imaginative lunches, as well as beverage services." CF 35. As set forth in her job description, this position required the "ability to perform various motor skills such as; lifting, reaching, bending, twisting, pushing, pulling, sitting, squatting, grasping and arm-hand coordination on a continuous basis," and "lifting and carrying heavy objects up to 40 pounds, as well as standing and/or walking for up to (7.5) seven and a half hours per day." *Id.*

### B.    The Long-Term Disability Plan

At all relevant times, Stanford provided its employees, including Beach, with long-term disability benefits under the Leland Stanford Junior University Group Long Term Disability Plan. Evans Decl. ISO Def.'s Mot. ("Evans Decl.") ¶ 4, ECF 29-1; Ex. A to McGee Decl., ECF 29-3, 29-4 (hereinafter, "Policy"). Plan participants are eligible for a 12-month "own occupation" Disability Benefit, and thereafter, an "any occupation" Disability Benefit up to the Maximum Benefit Period, when, following the expiration of the 90-day elimination period, Liberty receives proof that a Covered Person is "Disabled." Policy 4, 12.

The Policy of the Plan sets for the following definitions of disability to determine eligibility for benefits:

1. For persons other than pilots, co-pilots, and crew of an aircraft:

    i.   If the Covered Person is eligible for the 12 Month Own Occupation Benefit, **"Disability"** or **"Disabled"** means during the Elimination Period and the next 12 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

    ii.  After 12 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

3

CF 53.

The Plan provides for the discontinuation of the Disability Monthly Benefit upon the date the Covered Person is no longer "Disabled." Policy 17. The Plan also contains a Mental Illness Limitation, which states that the benefit for "Disability" due to "Mental Illness" will not exceed a combined period of 24 months of Monthly Benefit payments. *Id.* at 15.

When a Covered Person is employed, earning 20% of her Pre-Disability Earnings, and satisfies the definition of "Partially Disabled," she may be eligible for a Loss of Earnings Monthly Benefit under the Plan's separate Quick Recovery Program (Plus). Policy 13.

### C.    Beach's Medical Conditions and Disability Claim

In 2006, Beach began experiencing widespread pain on both sides of her body, above and below the waist, as well as the axial skeletal system. CF 1095. In March 2010, Dr. Jeffrey Fong diagnosed Beach with fibromyalgia. CF 115–19. Several months later, in July 2010, Dr. Victor Villacorta conducted a tender point examination, and diagnosed Beach with fibromyalgia. CF 225.

Notwithstanding reports of pain, Beach continued to work at Stanford without interruption through at least June 2012, when her physician, Dr. Inna Belenky, noted that Beach's pain was "worsening," and recommended various adjustments to her work schedule. CF 574, 577. Specifically, Dr. Belenky recommended that Beach work fewer hours. CF 577. It is not clear whether Beach complied with Dr. Belenky's recommendation. Subsequently, Beach took disability leave from sometime in May 2013 through mid-June 2013, when she returned to work part time. CF 775, 783, 788, 2219, 2709. Beach continued to suffer from fibromyalgia symptoms and depression, and on August 6, 2013, Dr. Sondra Zentner, Ms. Beach's psychiatrist, recommended that Beach take off work completely for two months, but Beach refused, instead opting to work part time. CF 2213.

On August 1, 2013, Ms. Beach submitted a claim for short-term disability benefits to Liberty, which it ultimately approved. CF 47, 49. When initially reporting why she believed herself unable to perform her job on a full-time basis, Beach explained that she had difficulty with the constant standing and 40-pound lifting requirements. CF 33–34, 1192, 1211–12, 1465, 2017,

United States District Court
Northern District of California

2219, 2353, 2611.  In addition to requesting records from Dr. Zentner, Beach's psychiatrist, from July 1, 2013 to present, CF 2756–59, Liberty also requested records from Beach's primary care physician, Dr. Belenky.  CF 2582–2609.  Dr. Zentner responded that Ms. Beach was able to work part time, without providing any explanation of the need for a modified work schedule.  CF 2727. Dr. Belenky also supported a part-time work schedule.  CF 2582–2609.  According to Dr. Belenky, Beach was to avoid standing more than 3 hours per day and was limited to light kitchen duties, but could perform desk/computer work without restrictions.  CF 2353, 2611.  Additionally, Beach was not to work for more than 5 hours per day total.  CF 2611.  Upon review of these records, Liberty approved Ms. Beach's short-term disability claim.  CF 47.

In October 2013, Liberty converted Beach's claim into a long-term disability claim due to the approaching expiration of the Plan's 90-day elimination period.  CF 44.  Accordingly, Liberty requested that Beach complete and return various forms and follow up with Dr. Belenky, Dr. Zentner, and any other treating providers to ensure they would provide her treatment records for Liberty's consideration.  CF 2291–92.  Liberty also sent medical records requests directly to Dr. Zentner and Dr. Belenky.  CF 2227–36.  After conducting an LTD interview and reviewing Beach's claimant forms and medical records, Liberty referred Beach's file to a third-party vendor for an independent panel review by an internal medicine specialist who was requested to speak peer-to-peer with Dr. Belenky, and a psychiatrist who was requested to speak peer-to-peer with Dr. Zentner.  CF 33–34, 2056–58, 2067–76.

On December 5, 2013, Liberty approved Beach to receive Partial Disability benefits under the Plan's "own occupation" standard on the basis that she was unable to perform the duties of her occupation on a full-time basis.  CF 1892–95.  The letter explained that Beach would continue to receive a Partial Disability benefit provided that all of the Plan's provisions continued to be met. CF 1893–94.  Liberty's decision was based upon the opinions of Dr. Enrique Olivares, a board certified psychiatrist who prepared an independent report evaluating Beach's psychiatric and mental health conditions; Dr. Harold Schechter, a board certified internist who prepared an independent panel peer review evaluating Beach's medical condition from a physical perspective; and an Occupational Analysis/Vocational Review prepared by Nancy Sullivan, MSEd, CDMS.

CF 1905–11, 1941–60.

Following the approval of her claim under the "own occupation" standard, Beach continued to work part time, with specific modifications, until her position was terminated on April 4, 2014. CF 29–36, 40–42, 49–60, 78–87, 90–99, 1504–06, 1612–39, 1716–26, 1804–15, 1866–69, 2026–28, 2237–44, 2303–63, 2617.

Although Beach received regular medical treatment between 2010 and mid-2013, she did not see Dr. Belenky for treatment of her fibromyalgia between September 2013 and April 2014. Instead, Ms. Beach and Dr. Belenky corresponded via email and spoke over the phone regarding Beach's requests for extended part-time work modifications. CF 1422–50. For example, on November 11, 2013, Beach reported to Dr. Belenky via email that her fibromyalgia flares were less frequent than before. CF 841. During this time, Beach was prescribed 50 mg of Tramadol, a pain medication. CF 824, 887, 938. On March 12, 2014, Beach asked Dr. Belenky, via email, to increase her dosage of Tramadol, as the current dosage did not always ease the pain. CF 874. Dr. Belenky responded that she would not advise increasing the dosage. *Id.*

On April 5, 2014, Ms. Beach's job was terminated by Stanford for reasons explained above. Stanford provided 8 months separation pay and enrollment in a career transition program. CF 21, 1540.

During a May 1, 2014 office visit with Dr. Belenky, Ms. Beach reported overall improvement in her pain symptoms, but noted that she still experienced flares two to three times a week. CF 886–887, 1445. The visit note sets forth the results from a musculoskeletal examination, and indicates that Beach had tenderness to palpitation over the parascapular areas, trapezius edge bilaterally, lateral epicondylse, medial knee condyles, and lower back. CF 1446. Dr. Belenky concluded that Ms. Beach's fibromyalgia was stable and might be improved with rest. CF 1448.

On May 7, 2014, Liberty advised Beach of its continuing evaluation of her claim. CF 1471–79. The letter explained that Beach was receiving a Monthly Benefit under the Plan's "own occupation" definition of Disability based upon her inability to perform her own occupation as a chef, however, the standard of disability would change effective November 5, 2014, after which

United States District Court
Northern District of California

6

Beach would have to submit proof of an inability to perform less physically demanding occupations in order to receive continuing benefits. CF 1471–72. The letter requested that Beach complete and return updated claimant forms. CF 1473–79. On her updated forms, Beach reported the ability to sit for 6 hours, stand for 3 hours, and walk for 4 hours per day. CF 1465.

Liberty again referred Beach's file to a third-party vendor for another independent panel review by an internal medicine physician, Dr. Aviva R. Lehrfield-Herschman, and an independent psychiatrist, Dr. Robert Solomon. CF 1350–63, 1410–12. Upon receipt of the independent panel review, Liberty informed Ms. Beach that her "own occupation" claim remained approved and would continue to be paid subject to the Mental Illness Limitation. CF 1348–49. Beach disputed that her claim should be subject to the Mental Illness Limitation. CF 14.

Around the same time, Beach emailed Dr. Belenky regarding her fibromyalgia and her disability claim, specifically to request support for the latter. CF 897. On August 11, 2014, Dr. Belenky wrote an email to Beach stating:

> I am happy to provide records to your insurance company if they request it. However, I do not feel comfortable stating that you are disabled because of fibromyalgia. In my opinion, you can work limited hours.

*Id.* In response, Beach indicated that she had not been feeling well and that she was not working because of fibromyalgia flare ups, and asked Dr. Belenky for a recommended course of action. *Id.* Dr. Belenky suggested that Beach meet with a chronic pain specialist, but Beach declined, stating that she went through the chronic pain program in 2010, and despite using the recommended techniques, her required work modifications led to her disability and ultimate layoff. CF 896.

Liberty continued to request updated medical records and office notes from Dr. Belenky regarding Ms. Beach's treatment. On September 4, 2014, Liberty requested records from May 2, 2014 to the present. CF 1324. Kaiser responded that Dr. Belenky did not have any medical records for the time period requested, neglecting to include the August 2014 correspondence between Dr. Belenky and Ms. Beach, as referenced above. CF 12, 900–01, 1277–80.

Liberty then requested updated claimant forms from Ms. Beach. CF 1236–43. On her updated forms, Beach reported the ability to sit for 5–6 hours, stand for 3 hours, and walk for 3–4

United States District Court
Northern District of California

United States District Court
Northern District of California

hours at a time. CF 1212. Nevertheless, she stated that she believed she was unable to work due to pain from fibromyalgia, fatigue, memory problems, "mental fogginess," and headaches. CF 1214.

At Beach's next appointment with Dr. Belenky on September 23, 2014, Dr. Belenky noted that Ms. Beach stated that she was no longer able to work because of diffused pain, was on disability due to depression, and had pain in her neck, trapezius areas, upper and lower back, paraspinous areas, and both hips anteriorly. CF 913. Beach also asked Dr. Belenky to certify that she is disabled because of fibromyalgia. *Id.* Dr. Belenky wrote that she "[e]xplained that there [was] no reason for disability in [her] opinion." CF 917. At that appointment, Dr. Belenky referred Beach to Dr. Chunbo C. Cai in the pain clinic. CF 917, 958, 979. Dr. Cai changed her medications in an attempt to better manage Beach's pain. CF 925. After that one visit, Beach wrote Dr. Cai the following email:

> Doctors due [sic] not want to state that fibromyalgia is disabling me but it is. I need verification that I can't work in this condition, despite my efforts to get treated for this. I am disabled, lost my job and about to loose [sic] my health insurance and support of my doctors. Can you help me with any documentation?

CF 958. Dr. Cai did not respond to Beach's request. Thereafter, in late October 2014, Beach came under the care of a new primary care physician, Dr. John Kuo-Yu Wung. CF 937.

Dr. Wung wrote that "whole body pain" diagnosed as fibromyalgia prevents Beach from working as a chef at full capacity, and that Beach requested a renewal of work status form for her employer. *Id.* Beach requested this from Dr. Wung despite having been terminated from her job at Stanford in April 2014. At another visit in November 2014, Beach told Dr. Wung that she had recently been fired from her job as a chef due to chronic pain that prevented her from being able to carry out her work duties, even though this was not the reason she was terminated and she had been terminated nearly 7 months earlier. CF961. Beach also asked Dr. Wung to provide a status update to assist her with her application for disability. CF 961. Throughout the rest of 2014 through at least mid-2015, Beach reported continuing, widespread pain to Dr. Wung. CF 995, 1031, 1095.

Around the same time, Liberty received an updated Work Status Report from Dr. Wung.

CF 1211.  Dr. Wung reported that Beach was limited to lifting up to 20 pounds, standing up to 3 hours per day, and light kitchen duties.  *Id.*  He also stated that Ms. Beach "can do desk work/computer work without restriction."  *Id.*  Finally, he stated that a 5-hour workday restriction applied only "if [she] cannot tolerate [the] pain."  *Id.*

On November 5, 2014, consulting psychiatrist Dr. Andrew Brown prepared a psychiatry review report concluding that Beach's records did not substantiate the inability to work due to impairing levels of mental illness.  CF 1190.  Instead, Dr. Brown opined that "non-medical factors . . . are driving the insured's claim of long-term work incapacity."  *Id.*  Dr. Brown noted that Beach requested and was given work restrictions based on her physical complaints, rather than her psychiatric condition.  CF 1192.  Moreover, Dr. Brown expressed concerns that Dr. Zentner saw her role as eliciting from Ms. Beach what Beach wanted conveyed to Liberty in support of her claim for disability rather than reporting Beach's condition accurately.  CF 1196.

After reviewing Plaintiff's updated file, Dr. Brown's report, and Dr. Lehrfield-Herschman's updated report,[3] Liberty advised Ms. Beach that benefits were no longer payable because she did not meet the Plan's "any occupation" standard of Disability.  CF 1181–85.  Accordingly, Liberty denied Beach's claim for long-term disability under the "any occupation standard.  CF 1184.

Two days later, Liberty was informed that the Social Security Administration had denied Beach's separate Social Security disability insurance claim.  CF 1174.

### D.    Beach Appeals and Liberty Review Thereof

On May 15, 2015, Beach submitted an appeal of the adverse benefit determination.  CF 87. She included a variety of exhibits including updated medical records, a publication by the National Institute of Arthritis and Musculoskeletal and Skin Disease regarding fibromyalgia, CF 1108–25, a narrative letter from Dr. Wung, a narrative letter from Dr. Jack Waxman, and a personal statement. CF 91–1157.  In her personal statement, Beach described her condition, stating that she suffers

---

[3] A nurse care manager reviewed Dr. Lehrfield-Herschman's report and Plaintiff's updated medical records, and concluded that the new information did not provide any clinical information to alter the findings of the prior review.  CF 1183–84.

from severe pain, fatigue, and mental cloudiness, among other issues. CF 1151. Because of her condition, Beach stated that she would be unable to work for more than 3 hours a day. *Id.* Dr. Wung wrote that Ms. Beach has been under his care since October 23, 2014, and "has been disabled from performing her former occupation as a chef for the whole time she has been under my care." CF 1132. He further wrote that "during her time under [his] care, it has not been medically reasonable to expect her to be able to return to work satisfactorily at any employment over an 8 hour work day/5 days per week at this time[.]"[4] *Id.* Finally, Dr. Waxman provided a narrative letter as well. Dr. Waxman examined Beach on April 23, 2015 after reviewing the medical records that Beach's counsel provided him. CF 1139. He found that Beach "had 16 tender points in a characteristic fibromyalgia distribution with pain level of 4/10 in the arms and legs, and 8/10 in the neck, shoulders and back." CF 1140. Dr. Waxman concluded that Ms. Beach was "fully disabled" in both 2014 and 2015 "from any employment requiring 8 hour days and 5 day work weeks[.]" *Id.*

Upon reviewing the appeal, Liberty referred the claim to the Appeals Review Unit to conduct an independent review of the benefit determination. CF 4, 87. The Appeals Review Unit sent the claim file for another independent review based on Beach's file and discussions with her treating physicians, and to comment on her functional capacity. CF 84–86. Dr. Neil P. Patel prepared an independent peer review of Beach's medical records and claim file documents obtained and received in the claim and on appeal, and spoke with Dr. Waxman. CF 63–81. When Dr. Patel spoke with Dr. Waxman on June 23, 2015, Dr. Waxman told him that he had not examined Beach "in a while," and he would need to examine her before he would be willing to comment on her medical and physical status. CF 67.

Dr. Patel concluded that Beach's records supported a diagnosis of fibromyalgia, degenerative changes and spinal stenosis of the cervical and lumbar spine, and degenerative changes of her right shoulder. CF 79. From a functional standpoint, Dr. Patel noted that these conditions would prevent Ms. Beach from performing strenuous physical work. *Id.* Dr. Patel

---

[4] The Court agrees with Plaintiff's interpretation that Dr. Wung opined that she could not work throughout an 8-hour day.

United States District Court
Northern District of California

opined that Beach could "sustain full time work capacity" with the following restrictions and limitations: Beach can lift up to 10 pounds occasionally, sit up to one hour at a time with the ability to change positions for comfort for a total of six hours in a day, stand occasionally, and walk occasionally. *Id.* Beach, however, cannot do overhead activities with the right upper extremity. CF 79–80. Finally, because her side effects from the prescribed medications were not clinically observed, Dr. Patel concluded they would not affect her impairments and functional capacity. CF 80.

After receiving Dr. Patel's report, Liberty referred Beach's claim for a vocational analysis to determine her transferable skills and evaluate whether she was able to perform occupations consistent with her training, education, experience, and the functional limitations set forth by Dr. Patel, if any. CF 62. On July 15, 2015, vocational specialist Jason Miller prepared a Transferrable Skills Analysis/Vocational Review report. CF 59–61. Based upon her education, training, and work history, Mr. Miller determined that Plaintiff had obtained transferrable skills in the form of management skills, food service skills, communication skills, customer service skills, and clerical skills. CF 60. The report identified several occupations consistent with Plaintiff's transferrable work skills and the functional limitations within which Dr. Patel concluded Plaintiff was able to work on a full-time basis, including customer service supervisor, order clerk supervisor, dietary manager, and purchasing clerk, among others. CF 61. The transferrable skills analysis also noted that occupations identified in the report would offer Beach sufficient opportunity to change positions between sitting and standing, as needed for comfort. *Id.*

Based on the complete file review on appeal, Liberty determined that the evidence did not support a finding that a physical or psychological impairment rendered Ms. Beach Disabled from performing "any occupation" under the Plan. CF 3, 53–58.

## III. JUDICIAL NOTICE

Before addressing the substance of the parties' motions, the Court considers the requests for judicial notice filed by the parties. *See* Pl.'s Mot.; Def.'s Opp'n to Pl.'s Mot., ECF 34; Pl.'s Opp'n to Def.'s Mot., ECF 45; Def.'s Reply ISO Mot., ECF 47.

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to

11

reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Both parties make requests for judicial notice.

In her motion, Beach requests the Court take judicial notice of an article about fibromyalgia posted online by the National Institute of Arthritis and Musculoskeletal and Skin Diseases. Pl.'s Mot. 5; CF 1107–25. Defendant does not object to this request, and in fact cites to it. Def.'s Opp'n to Pl.'s Mot. 3. The request for judicial notice of this article is GRANTED; provided, however, it is received for the limited purpose of showing that it was published, and not for the matters asserted. *Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.118 (9th Cir. 1999).

Plaintiff also requests that the Court take judicial notice of what she claims to be Dr. Neil P. Patel's website and the contents thereof. Pl.'s Opp'n to Def.'s Mot 4. Liberty objects to this request for judicial notice, arguing that a private website is not a proper subject of judicial notice. Def.'s Reply ISO Mot. 14. Liberty also contends that the cited website does not belong to Dr. Patel. *Id.* The Court agrees with Liberty that the information appearing on the third-party website is not a proper subject of judicial notice because it is not capable of accurate and ready determination. *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015). Thus, the Court DENIES this request for judicial notice.

For its part, Liberty requests that the Court take judicial notice of the following facts: (1) fibromyalgia is one of the most commonly treated physical medicine and rehabilitation (PM&R)-related conditions; (2) PM&R physicians are qualified experts that are competent to comment on physical restrictions and limitations due to fibromyalgia; and (3) the occupations identified in the Transferrable Skills Analysis/Vocational Review can be performed on a part-time basis. Def.'s Opp'n to Pl.'s Mot. 22; Def.'s Reply ISO Mot. 13. Beach does not object to Defendant's request. Accordingly, because the information is capable of accurate and ready determination and Plaintiff does not contest its accuracy, the Court GRANTS Defendant's request for judicial notice.

## IV.    CONCLUSIONS OF LAW[5]

Review of an ERISA benefit determination begins with relevant language.  *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1099–1100 (C.D. Cal. 2009). Here, Plaintiff bears the burden of proving "Disability" as defined by the Plan at the time of the termination of benefits.  In this case, Liberty paid the maximum benefit under the Plan's "own occupation" standard of Disability.  Upon expiration of the 12-month "own occupation" benefit, Plaintiff was required to demonstrate an inability to perform her "own or any other occupation for which [s]he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."  Thus, in order to meet her burden, Plaintiff must point to substantial evidence that she is incapable of performing occupations consistent with her transferrable skills, not just her occupation as a chef, or her prior job at Stanford.

"The language of the any occupation standard is not demanding."  *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1219 (9th Cir. 2008) (citation and internal quotation marks omitted).  "It requires only that [Plaintiff] be able to perform a job for which [s]he is qualified or for which [s]he can reasonably become qualified by training, education or experience."  *McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d 1310, 1317 (9th Cir. 1994), *overruled on other grounds by Inciong v. Fort Dearborn Life Ins. Co.*, 570 Fed. Appx. 724 (9th Cir. 2014). Specifically, Plaintiff must prove that she is unable to perform any job consistent with her training, education, or experience without consideration of her pre-disability salary.  *Pannebecker*, 542 F.3d at 1220; *Haber v. Reliance Std. Life Ins. Co.*, No. CV 14-9566, 2016 WL 4154917, at *7 (C.D. Cal. Aug. 4, 2016) ("The Ninth Circuit has explicitly rejected considering an employee's pre-disability salary when the language of the policy required consideration of 'any occupation for which [the employee is] reasonably fitted by training, education, experience, age, and physical or mental capacity." (citing and quoting *Pannebecker*, 542 F.3d at 1220)).

Still more difficult to establish, Plaintiff bears the burden of proving she is unable to

---

[5] Finding no prejudice to Liberty, the Court considers Plaintiff's opening brief and OVERRULES Defendant's objection to Beach's opening brief for its failure to set forth a succinct statement of facts.  *See* Def.'s Opp'n to Pl.'s Mot. 1.  For the same reason, the Court DENIES Defendant's motion to strike all of Plaintiff's factual assertions unaccompanied by foundational evidentiary support and citation to an unpublished case, though the Court does not consider the latter.  *Id.* at 2.

perform any part-time work in order to recover under the "any occupation" standard. *Shane v. Albertson's Inc. Emps.' Disability Plan*, 381 F. Supp. 2d 1196, 1206 (C.D. Cal. 2005); *Graeber v. Hewlett Packard Co. Emp. Benefits Org. Income Prot. Plan*, 421 F. Supp. 2d 1246, 1254 (N.D. Cal. 2006). The *Graeber* court considered this issue and concluded that a claimant capable of working 20 hours per week is not unable to work in "any occupation" and thus not entitled to disability benefits beyond the "own occupation" benefit. *Graeber*, 421 F. Supp. 2d at 1254–55. In construing nearly identical language to the language at issue here, the court reasoned that language requiring a claimant to be unable to work at any occupation meant that a claimant "must not be able to work at all, not even part time." *Id.* at 1254. *Graeber* expressly rejected the argument that disability eligibility turned on the ability to perform full-time work: "The Court rejects plaintiff's assertion that a Plan Member is entitled to long-term disability benefits unless [s]he can work full time in any occupation. Plaintiff's argument is belied by the plain meaning of the 'any occupation' standard and the case law." *Id.* at 1256. Similarly, in *Shane,* the court found, on *de novo* review, that a claimant capable of performing part-time work was ineligible for "any occupation" benefits. 381 F. Supp. 2d at 1206.

The Ninth Circuit has not addressed the part-time issue beyond Judge Robart's unpublished dissent in *Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 282 Fed. Appx. 599, 604 (9th Cir. 2008), in which Judge Robart concluded that a claimant is not entitled to "any occupation" benefits if she can perform part-time work. While the Ninth Circuit has not finally decided the issue, most if not all other circuits are in accord. *See McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1067–68 (6th Cir. 2014) ("It is reasonable to conclude that an ability to do some work means one is not unable to do 'any work.'"); *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 655–57 (5th Cir. 2009) (finding the fact that the plaintiff was working part time supported a determination that she was not unable to perform "any occupation"); *Brigham v. Sun Life Can.*, 317 F.3d 72, 83–84 (1st Cir. 2003) (holding that paraplegic was not "totally disabled, i.e., physically unable to work on even a part-time basis"); *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067–68 (8th Cir. 2002) (recognizing that "total disability" precluded a claimant who was able to work part time); *Ladd v. ITT Corp.*, 148 F.3d 753,754 (7th Cir. 1998) (claimant who was able to

14

work part-time not totally disabled under policy requiring her to be "unable to engage in any and every duty pertaining to any occupation or employment for wage for which you are qualified").

Regardless, the Court need not reach the part-time work issue in this case because the evidence persuasively shows that Plaintiff retains the capacity, on a full-time basis, to perform several alternative occupations that are consistent with her with training, education, and experience.[6] Liberty obtained a Transferrable Skills Analysis/Vocational Review, which concluded that Beach was able to perform seven occupations on a full-time basis that were consistent with her transferrable work skills and her functional capacity. CF 59–61. Beach does not contest the accuracy of these reports to the extent that they identify other occupations she would be qualified to perform, but rather rests her case on the nature and scope of her physical impairments as disqualifying her from any full-time work.

### A.    Evidence of Physical Impairments

In order to recover benefits, Plaintiff must prove the existence of physical impairment(s) and a resulting incapacity to perform the responsibilities of "any occupation." *Seleine*, 598 F. Supp. 2d at 1100. "The mere existence of an impairment is insufficient proof of disability. A claimant bears the burden of proving that an impairment is disabling." *Id.* (citing and quoting *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)). "It is an individual's ability to function, not simply their diagnosis, that entitles him or her to disability benefits." *Holifield v. UNUM Life Ins. Co. of Am.*, 640 F. Supp. 2d. 1224, 1237 (C.D. Cal. 2009). Plaintiff appears to rely solely on her diagnosis of fibromyalgia, but Plaintiff's diagnosis is not the inquiry. Rather, the question is whether she was capable of performing alternative work consistent with her training, education, and experience, in light of her functional limitations from fibromyalgia. *Id.*

The fact that Beach carried a diagnosis of fibromyalgia and reported pain symptoms that she believed prevented full-time work does not, standing alone, mean she was "Disabled" under the Plan. *Seleine*, 598 F. Supp. 2d at 1100; *Jordan v. Northrop Grumman Corp. Welfare Benefit*

---

[6] The Court notes that Beach thought she only had to prove that she could not work full time to qualify for disability. And, in its denial letter, Liberty relied on the fact that Beach could work full time. Despite having received Liberty's opening brief wherein it indicated that an ability to work part time would preclude a finding of disability, Beach did not seek to augment the record.

United States District Court
Northern District of California

*Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled on other grounds as recognized by Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673–74, 678 n.33 (9th Cir. 2011). "Under ERISA, an administrator is not free to accept a conclusion in a medical report without considering whether that conclusion follows logically from the underlying medical evidence." *Seleine*, 598 F. Supp. 2d at 1101 (citation omitted). Courts in the Ninth Circuit have repeatedly affirmed the requirement that a claimant provide substantiating evidence that a diagnosis has reached a disabling level, even where the underlying condition is fibromyalgia and diagnosed upon subjective complaints of pain. *See, e.g.*, *id.* at 1101–03; *Jordan*, 370 F.3d at 877; *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1191–92 (C.D. Cal. 2008); *Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1118–19 (C.D. Cal. 2007). Courts draw a clear distinction between requiring objective evidence to establish a medical condition unsusceptible to objective verification, as distinct from a valid request for evidence establishing ongoing disability preventing the claimant from performing work. *Jordan*, 370 F.3d at 875–77; *Safavi*, 493 F. Supp. 3d at 1118; *Holifield*, 640 F. Supp. 2d at 1237–38; *Bratton v. Metropolitan Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006).

In this case, Beach worked for years as a chef notwithstanding her diagnosis of fibromyalgia. In August 2013, Beach experienced fibromyalgia-related difficulties when performing her physically demanding job, which caused her to submit a Partial Disability claim due to her need for modifications to the constant standing and heavy lifting requirements. While she was capable of performing full-time sedentary capacity work at that time, Liberty approved her Partial Disability claim due the significant demands of her occupation, which required medium-to-heavy physical functional capacity. After submitting her claim, she was able to continuously work between 5-to-6 hours per day in her medium-to-heavy capacity job, within specified modifications limited to the heavy lifting and standing requirements. During that time, Beach was actively pursuing a career transition into a sedentary occupation, expressing interest in becoming an administrative assistant, purchasing clerk, or accounts payable/receivable clerk. While considering her alternative vocational opportunities, Plaintiff continued to work until Stanford terminated her position in connection with a planned transition to provide catered food

16

for its faculty—she did not stop working due to her condition, but rather her layoff.

Until her layoff, Plaintiff's restrictions had consistently been confined to prolonged standing and heavy lifting considerations; she never claimed an inability to perform less strenuous work until she became aware of the pending expiration of her "own occupation" benefit under the Plan after which her eligibility for continued benefits would change considerably and require her to show an ability perform the sedentary occupations that she was actively pursuing and had long represented were compatible with her fibromyalgia symptoms. Thereafter, Plaintiff changed her account of her work limitations to comport with the "any occupation" standard of "Disability" by claiming that her fibromyalgia symptoms had suddenly prevented any work whatsoever. This abrupt reversal lacked credibility because: (1) Beach had recently become unemployed; (2) she had not seen a rheumatologist for years; (3) she was not actively seeking treatment for fibromyalgia, despite her sudden reports of incapacitating pain; (4) there was no change in her clinical condition; and (5) she otherwise denied any changes in her physical capacities and daily activities.

The only evidence proffered by Plaintiff to satisfy her burden of proof are her own subjective reports, documented in her medical records and statements to Liberty, along with the narrative statements of Dr. Wung and Dr. Waxman. Preliminarily, Plaintiff's subjective complaints of pain are not accepted at face value when determining her ability to work. *Jordan*, 370 F.3d at 875–77; *Kushner*, 572 F. Supp. 2d at 1191 ("Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary." (citation omitted)); *Munn v. Hertz Long-Term Disability Plan*, No. C 08-1942, 2010 WL 11492849, at \*20 (N.D. Cal. Sept. 7, 2010) (same). For example, in *Safavi*, the court rejected the claimant's argument that her subjective reports should be determinative of disability, holding that any such rule would effectively turn the plaintiff into both the claimant and the claims administrator. *Safavi*, 493 F. Supp. 2d at 1118. Further, narrative personal statements are not competent evidence upon which disputed facts can be based, *Shaw*, 144 F. Supp. 3d at 1135–36, especially in light of the facts warranting a discrediting of Plaintiff's self-reports, as discussed below.

Here, Beach's subjective reports of pain are set forth in her correspondence with Liberty

17

United States District Court
Northern District of California

and her statements to her treating physicians, later transcribed into her medical records. However, the transcription of Plaintiff's subjective reports do not constitute medical "findings"—the fact that a treating physician has an obligation to record the symptoms reported by a patient does not elevate the notation of her subjective complaints to a medical finding. *Seleine*, 598 F. Supp. 2d at 1102–03. "Treating physicians are more or less required to accept the representations of their patients, but . . . an ERISA administrator is not obligated to do so." *Id.* at 1102; *Holifield*, 640 F. Supp. 2d at 1245 ("the record . . . does not show 'findings' by medical professionals as much as mere recordings of [plaintiff's] own complaints"); *Alvis v. AT&T Integrated Disability Serv. Ctr.*, No. 07-cv-984, 2009 WL 1026030, at \*17 (E.D. Cal. Apr. 15, 2009) ("[T]he records of Plaintiff's treating physician on which Plaintiff would have the [court] rely are largely no more than a reiteration of Plaintiff's subjective complaints. Plaintiff's allegations are not medical 'findings.'"). Moreover, Plaintiff's practice of citing to emails to evidence her medical treatment, rather than actual visits, portends doubt as to whether she was seeking active clinical care and treatment for fibromyalgia instead of building her own case for disability.

The Court finds that Beach's sudden claim of total work incapacity following her job termination and learning of the pending change in "Disability" definition lacks credibility under the particular circumstances of this case. Courts in the Ninth Circuit have considered several circumstances in which a claimant's subjective reports of incapacitating pain should be discredited and discounted for purposes of the "Disability" determination. A claimant's unemployment upon the discontinuation of disability benefits is a factor that courts may consider. *Kushner*, 572 F. Supp. 2d at 1191; *Graeber*, 421 F. Supp. 2d at 1253–54. Here, Plaintiff never once claimed that her fibromyalgia prevented her from working altogether during the seven months she remained employed by Stanford; to the contrary, her first reports of pain preventing all work did not surface until her job had been terminated and she became aware of the pending change in "Disability" definition to "any occupation." The Court rejects Plaintiff's plea that she not be punished for soldiering on at work despite her doctor's approval of reduced work.

Another factor to consider in evaluating Plaintiff's self-reports that her fibromyalgia-related pain had suddenly reached an incapacitating level is the sporadic nature of her treatment

18

for fibromyalgia. *Bratton*, 439 F. Supp. 2d at 1052; *Orn v. Astrue*, 495 F.3d 625, 637–38 (9th Cir. 2007) (discussing denial of Social Security benefits). Following the August 1, 2013 submission of her claim, Plaintiff did not actively seek care for fibromyalgia—she had not seen her rheumatologist for approximately three years, and saw Dr. Belenky, the only physician treating her fibromyalgia, only once throughout the entire year after submitting her claim. After her job termination, Plaintiff was never seen by a rheumatologist despite her sudden claim of incapacitating pain, and Dr. Belenky opined that there was "no reason for disability" at her next office visit on September 23, 2014, notwithstanding Plaintiff's pleas for disability advocacy. The fact that Plaintiff was not seeking active treatment contemporaneous with her newly-framed claim for incapacitating pain preventing her from performing any occupation in the months following her termination provides a basis to discredit the severity of her subjective reports. *Orn*, 495 F.3d at 637–38. Moreover, after the denial of her claim, and her initiation of treatment with new providers, Dr. Cai and Dr. Wung both encouraged Plaintiff to begin a pain management course; however, Plaintiff declined because she felt "the hours [were] too demanding for her." CF 1009. The failure to follow a recommended course of treatment casts doubt on the sincerity of Plaintiff's subjective reports and is probative of the credibility of her pain complaints. *Orn*, 495 F.3d at 637–38.

The Court may also consider Plaintiff's physical capacities and her admitted ability to perform household chores, child-care duties, and other daily activities, including her ability to vacation in Florida, in determining whether her pain prevented her from working. *Holifield*, 640 F. Supp. 2d at 1231, 1243; *Seleine*, 598 F. Supp. 2d at 1102 ("[T]he Court observes that Seleine's activities—cooking, cleaning, shopping, laundry, regular exercise, etc.—are inconsistent with her claims of severe and debilitating pain."). Plaintiff's claim forms reported the ability to perform many activities that appear inconsistent with an inability to perform any work. What's more, Plaintiff's substantial capacities and daily activities at the time she demonstrated an ability to work for Stanford are virtually indistinguishable from the capacities and daily activities she reported to Liberty after her sudden claim of incapacitating pain preventing all work. Thus, Plaintiff's physical capacities and daily activities remained unchanged from the time she was able to work

United States District Court
Northern District of California

with fibromyalgia, thereby providing a reasonable basis to question her sudden claim of severe pain preventing any work at all.

Finally, district courts are instructed to utilize "ordinary techniques of credibility evaluation" in determining whether a claim of disabling pain is to be credited as reliable evidence. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (appeal of denial of Social Security benefits). Specifically, where a claimant has made prior statements inconsistent with a claim of incapacitating pain, or has been less than candid in other aspects of her claim, traditional factors of credibility evaluation should be taken into account in weighing the subjective reports. *Id.* In this case, there simply is no reliable evidence to suggest that Plaintiff's longstanding fibromyalgia condition suddenly began causing a level of pain precluding less physically demanding work contemporaneous with her job termination; whereas, the context of her reversal in position concerning her ability to work if provided modifications for constant standing and heavy lifting was suspicious. Beach long believed that she was able to perform sedentary work and only changed her subjective reports of pain after Stanford terminated her and she became aware that her eligibility for benefits would soon be determined based upon her ability to perform any occupation, rather than her demanding occupation as a chef. Moreover, her failure to treat with a rheumatologist or seek active care for fibromyalgia, refusal to follow a recommended course of treatment, and her retained physical capacities and ability to vacation all give reason to question the veracity of her subjective reports. *See Shaw*, 144 F. Supp. 3d at 1133 ("Shaw's failure to comply with recommended treatment plans and her refusal to seek certain types of treatment . . . are factors to weigh in assessing credibility[.]").

### B.    Consideration of Treating Physicians

Next, with respect to the opinions of Beach's treating physicians, the Court affords the greatest weight to the findings of Dr. Belenky, who treated Plaintiff's fibromyalgia for more than three and half years, contemporaneous to the period of her disability claim. *Id.* at 1130 ("[C]ourts have typically afforded greater weight to the opinions of physicians who have treated the claimant for an allegedly disabling condition for a long period of time."). Here, Dr. Belenky found that there was "no reason for disability" at the time Liberty denied her "any occupation" claim, which

20

constitutes persuasive evidence that Beach is not entitled to "Disability" benefits in this case.

Although Dr. Wung opined that Beach was not able to work throughout an 8-hour day "at any employment," his opinion is entitled to little weight due to the brevity of his treatment and the incorrect representations made to him by Beach regarding the reason for her job loss. As a preliminary matter, the treating physician rule does not apply to ERISA disability actions, in recognition that a treating physician may favor supporting a patient's claim for work incapacity without valid reason. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003); *Holifield*, 640 F. Supp. 2d at 1241; *Shaw*, 144 F. Supp. 3d at 1130. Second, the short duration of Plaintiff's treatment relationship with Dr. Wung militates against affording significant weight to his opinion. *Id.* ("The assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense, when, for example, the relationship between the claimant and the treating physician has been of short duration[.]").

In this case, Beach initiated care with Dr. Wung on October 23, 2014 and, at her very first visit, sought support for work modifications for her job as a chef, concealing her termination approximately six months earlier. Absent any prior treatment history to draw from, Dr. Wung obliged Beach's request. Still, at that time, Dr. Wung set forth modifications applicable to her occupation as a chef: she could lift up to 20 pounds and stand up to 3 hours per day; she could perform light kitchen duties; she was unrestricted in desk/computer work; and the prior 5-hour workday restriction applied only if she was experiencing pain on that particular day. Three weeks later, she returned to Dr. Wung for her second visit and sought support for disability and misrepresented that she had recently been terminated by Stanford because she was unable to carry out her work duties (when, in fact, she had been terminated due to the elimination of her job position at Stanford), thereby concealing the timing of her layoff and falsifying the reason for her termination. Dr. Wung then expanded his opinion beyond her occupation as a chef. Regardless, this Court need not "accept [Dr. Wung's] opinion, especially when the opinion changed after [Stanford] laid plaintiff off and [Liberty] terminated [her] benefits." *Graeber*, 421 F. Supp. 2d at 1253–54.

Dr. Waxman's opinion is not entitled to significant weight for the same reasons

United States District Court
Northern District of California

undermining Dr. Wung's opinions. *Shaw*, 144 F. Supp. 3d at 1130. However, even more importantly, Dr. Waxman refused to reconfirm his generalized opinion that Plaintiff would be unable to perform alternative occupations on a full-time basis when contacted by Dr. Patel to discuss Plaintiff's physical limitations. CF 67. During the call, Dr. Waxman declined to support Beach's claim or even confirm that Beach was functionally impaired on the basis that he had not seen her recently. *Id.* A physician's failure to respond and comply with peer-to-peer contact undermines evidence in the petitioner's favor. *Jordan*, 370 F.3d at 878; *Harper v. UNUM Life Ins. Co. of Am.*, 621 F. Supp. 2d 931, 951 (E.D. Cal. 2008). Therefore, the Court treats Dr. Waxman's opinion as "less reliable or unreliable." *Id.*

Even if the treating physician rule applied, a treating physician's opinion may be rejected where it is unsupported by objective evidence or contradicted by other statements or assessments of Plaintiff's condition. *Holifield*, 640 F. Supp. 2d at 1241–42; *Hans v. UNUM Life Ins. Co.*, No. CV 14-2760, 2015 WL 5838462, at \*12 (C.D. Cal. Oct. 5, 2015). Ultimately, this Court is not bound by Plaintiff's subjective reports of total work incapacity, or the unsupported conclusions and opinions of Drs. Wung and Waxman. *Seleine*, 598 F. Supp. 2d at 1101. Instead, this Court must look beyond Plaintiff's self-reported pain symptoms to the totality of the record before determining whether she was completely unable to work. *Holifield*, 640 F. Supp. 2d at 1245–46. In so doing, this Court finds that the evidence taken as a whole, including the unanimous opinions of the multiple independent reviewing physicians who concluded that Plaintiff retained the capacity to perform full-time work, warrants a denial of Plaintiff's claim under the "any occupation" standard.

### C. The Opinions of Medical Reviewers

The fact that Liberty relied, in part, on the opinions of medical reviewers who spoke with Plaintiff's providers, but did not personally examine her, does not discredit the claim determination. *Gunn v. Reliance Std. Life Ins. Co.*, 399 Fed. Appx. 147, 151–53 (9th Cir. 2011). The three independent physicians retained to review Plaintiff's medical records, contact her treating physicians, and evaluate her functional capacity—Dr. Schechter, Dr. Lehrfield-Herschman, and Dr. Patel—unanimously concluded that Plaintiff was able to perform, with

United States District Court
Northern District of California

reasonable continuity, full-time work within her functional limitations due to fibromyalgia. Record reviews by medical consultants are universally accepted as substantial evidence on which the Court may rely, even where the independent physician's opinion conflicts with the opinion of the treating physician. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635–36 (9th Cir. 2009); *Jordan*, 370 F.3d at 880.

Here, there is no reason to question the credibility of the independent physicians who opined on Plaintiff's restrictions and limitations.[7] Liberty did not pay these physicians or have any direct contact with them; rather, payment and correspondence was through a third-party vendor. Regardless, "the mere fact that a physician receives compensation from a plan administrator for performing medical reviews is insufficient by itself to be probative of bias." *Polnicky v. Liberty Life Assur. Co. of Boston*, No. C 13-1478, 2014 WL 969973, at *2 (N.D. Cal. Mar. 5, 2014). There is simply no basis to question the independent physicians' credibility here. *Lavino v. Metro. Life Ins. Co.*, 779 F. Supp. 2d 1095, 1104 (C.D. Cal. 2011) (requiring evidence indicating that the physician conducting the review "has historically demonstrated a bias" in favor of the insurer).

The Court also finds Plaintiff's criticism of the independent physicians' fields of specialization to be unfounded. Plaintiff belabors the fact that Dr. Schechter, Dr. Lehrfield-Herschman, and Dr. Patel are not rheumatologists, and thus somehow not qualified to comment on functional limitations relating to fibromyalgia. However, Plaintiff's argument is belied by the fact that she herself was not treating with a rheumatologist at any time pertinent to her claim. The treating physician monitoring her fibromyalgia in the years before and after the submission of her claim, Dr. Belenky, is an internist. Further, the treating physician with whom Beach later established care, and the only treating physician to whom Plaintiff references for support of her claim, Dr. Wung, is similarly not a rheumatologist, but rather an internist. Thus, Plaintiff's criticism is not well taken. To the extent that the opinions of Dr. Schechter or Dr. Lehrfield-Herschman are questioned on the basis of their specialty as internists, the same holds true for Dr.

---

[7] Further, there was no obligation or need to obtain an independent medical examination ("IME"). *Rutledge v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 661 (8th Cir. 2007).

23

United States District Court
Northern District of California

Wung.  Plaintiff does not otherwise take issue with Dr. Schechter's independent peer review and the Court credits his opinion that Plaintiff was capable of performing full-time sedentary work with restrictions against standing more than three hours per day and lifting more than 10 pounds occasionally.

The Court equally finds Plaintiff's attempt to discredit Dr. Patel's opinion unpersuasive. On appeal, Liberty accepted and acknowledged that Plaintiff was diagnosed with fibromyalgia and sought the opinion of a physician board certified in physical medicine and rehabilitation (PM&R), along with pain medicine, to evaluate Plaintiff's functional capacity.  At issue was Plaintiff's functional limitations.  As a practicing PM&R physician, with further specialty in pain management, Dr. Patel was qualified to comment on Plaintiff's functional restrictions and limitations due to fibromyalgia.  In this regard, Dr. Patel expressly acknowledged, considered, and accounted for Beach's chronic fibromyalgia pain when concluding that her ability to lift, sit, stand, and walk was impaired, and she would be limited to full-time sedentary capacity work on a permanent basis.  Plaintiff's unfounded assertion that Dr. Patel failed to understand that her fibromyalgia would interfere with her ability to work is simply unsupported by the record.[8]

The Court similarly rejects Plaintiff's critique of Dr. Lehrfield-Herschman, whose independent peer review report correctly concluded that Plaintiff's medical file, at that time, did not contain physical exam findings that would support a diagnosis of fibromyalgia.  Neither Plaintiff nor her physicians had provided any medical records documenting a diagnosis of fibromyalgia consistent with accepted rheumatologic criteria until her appeal, when Plaintiff provided the records from Dr. Victor Villacorta.  The prior absence of these records from Liberty's file is best explained by the fact that Plaintiff ceased treatment with her rheumatologist in November 2010, never sought any further rheumatologic care or treatment at any time

---

[8] Moreover, *Rouleau v. Liberty Life Assurance Co. of Boston*, No. 15-cv-546, 2017 WL 359466 (W.D. Mich. Jan. 25, 2017) is distinguishable, even if it involves the same Dr. Patel.  The *Rouleau* court considered the opinion of a "Dr. Patel," which was based upon an incomplete file that omitted important medical records, the claimant's self-reported activities questionnaires, and the SSA's determination that the claimant was totally disabled. *Rouleau*, 2017 WL 359466, at *8. Based upon these unique facts, the court concluded that a treating physician's conflicting opinion was entitled to more weight. *Id.* at *7–8.  None of those considerations apply here.

24

thereafter, and never identified a rheumatologist in any of her claimant forms as a treating physician so that Liberty could obtain those records.  The absence of these records due to Plaintiff's cessation of active treatment with a rheumatologist validates Dr. Lehrfield-Herschman's opinion at that time.

Plaintiff cites to *Backman v. UNUM Life Insurance Company of America*, 191 F. Supp. 3d 1053, 1067 (N.D. Cal. 2016) for the generalized proposition that pure "paper reviews" performed by an administrator's employees may be given less weight than the opinion of treating physicians under certain circumstances.  Pl.'s Mot. 20.  In this case, however, the independent peer reviews obtained by Liberty were not "paper reviews" in that they involved peer-to-peer communications and interactions.  Further, they were performed by independent physicians retained by a third-party vendor, and not employed by Liberty.  Drs. Schechter and Patel engaged in peer-to-peer telephone communications with Beach's treating physicians.  Dr. Lehrfield-Herschman made four separate attempts to discuss Plaintiff's functional limitations with Dr. Belenky, who never returned her calls.

Regardless, *Backman* is inapposite to the instant case.  Unlike here, *Backman* involved the denial of the claimant's "own occupation" claim despite the presence of severe sitting restrictions due to radiculopathy.  191 F. Supp. 3d at 1057.  In *Backman*, the administrator represented that it would give significant weight to the SSA's finding that the claimant was disabled and eligible for SSDI benefits.  *Id.*  Further, the claimant was unable to sit for more than 15 minutes and required the ability to lie down at will, thereby precluding her from performing her sedentary job as an accounting manager.  *Id.* at 1060, 1064–66.  Significantly, "the evidence from every doctor who examined Backman was that she was unable to return to work due to her condition."  *Id.* at 1067.  Here, by contrast, the treating physician responsible for treating Beach's fibromyalgia contemporaneous to her claim for work incapacity found there was "no reason for disability." At its core, *Backman* took issue with the administrator's complete disregard of the claimant's treating physicians' opinions without explanation.  *Id.* at 1071 ("Here, Unum maintained its opinion that Backman's pain was out of proportion to the clinical and diagnostic findings in the record, despite contrary conclusions from her treating physicians, with little credible explanation for why it

United States District Court
Northern District of California

dismissed those conclusions."). Beach's treating physicians, however, found her to be not disabled; thus, *Backman* is distinguishable. Further, *Backman* criticized the fact that the administrator ignored not only the findings of the claimant's treating physicians, but also the contradictory conclusion of the SSA, *Backman*, 191 F. Supp. 3d at 1067–68, 1070–71, whereas, here, Liberty's decision was consistent with the SSA's determination that Plaintiff's fibromyalgia was not disabling. CF 1174.

### D.    Liberty Does Not Offer New Bases for Denial of Benefits

Lastly, Plaintiff's contention that Liberty has raised entirely new bases for the termination of her claim in this litigation is without merit. *See* Pl.'s Opp'n to Def.'s Mot. 14. The fact that she stylizes Liberty's argument as entirely new bases for denial does not make them so—Liberty has simply articulated in greater detail the reasons for its denial based upon the record supporting its determination that the evidence did not meet the "any occupation" standard. Liberty has maintained that Beach is not entitled to benefits because she has failed to provide proof that she is "Disabled" under the Plan's "any occupation" definition. Indeed, Liberty has not offered any new reasons for denial or other litigation defenses—it has not asserted a new Plan exclusion, limitation, condition, or basis for defense; rather, Liberty has highlighted specific facts supportive of its position that the evidence within the record is insufficient to support restrictions and limitations precluding alternative work. The cases Plaintiff cites—*Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719–20 (9th Cir. 2012) and *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1138–39 (C.D. Cal. 2015)—are distinguishable, as those cases involved entirely new bases for denial, not references to facts, evidence, or "reasons" supporting the insurer's basis for denial. *See* Pl.'s Opp'n to Def.'s Mot. 14–15. Moreover, those cases do not apply to *de novo* review.

### E.    The Social Security Administration's Denial of Disability

Finally, Liberty's determination that Beach's fibromyalgia would not preclude her from performing alternative work is validated by the SSA's independent conclusion that her fibromyalgia does not prevent her from working. The Court is not aware of any cases in the Ninth Circuit or elsewhere that have held that a claimant is entitled to "any occupation" long-term

United States District Court
Northern District of California

26

disability benefits where the SSA assessed the same claimant to be not disabled.  Accordingly, the Court finds Social Security Administration's parallel finding that Plaintiff's fibromyalgia is not disabling constitutes persuasive evidence that she is not entitled to "any occupation" benefits in this case.

**V.    ORDER**

For the foregoing reasons, the Court concludes that Beach has not shown by a preponderance of the evidence that she was disabled from her regular occupation as defined under the Plan, and Liberty's termination of long-term disability benefits and its subsequent denial of her appeal were correct under *de novo* review.

Accordingly, the Court GRANTS Liberty's motion for judgment under Rule 52 and DENIES Beach's motion for judgment.

**IT IS SO ORDERED.**

Dated: June 28, 2017

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

27