SCHIFFMAN LAW OFFICE, P.C.
HELPING THE INJURED AND DISABLED SINCE 1975

Lisa Counters, 016436
4506 N 12th Street
Phoenix, AZ 85014-4246
Voice: (602) 266-2667
Fax: (602) 266-0141
Lisa@Schiffmanlaw.com
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Leslie Marcus,<br><br>                              Plaintiff,<br>vs.<br><br>Lincoln National Life Insurance Company,<br><br>                              Defendant. | No. 2:24-cv-00228-ROS<br><br>**PLAINTIFF'S REPLY BRIEF** |

Defendant Lincoln National Life Insurance Company ("LFG") contends that it considered Leslie Marcus' ("Leslie") evidence but rejected it in favor of its paper reviewers. But LFG cannot reject Leslie's subjective complaints. LFG's decision was an abuse of discretion.

**I.      LESLIE HAS CONFIRMED DIAGNOSES THAT PRECLUDE EMPLOYMENT IN ANY OCCUPATION**

LFG's factual recitation outlines all the negative findings in Leslie's Mayo Clinic records. (Response Brief, Dkt. 26 at 3) But every treating physician and peer reviewer concur that Leslie has Chronic Fatigue Syndrome/Myalgic Encephalitis ("CFS/ME"). CFS is a diagnosis of exclusion, and a litany of negative test results only serves to rule out alternative diagnoses; it does not mean Leslie is okay. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 669 (9th Cir. 2011) ("Contrary to her inference that Salomaa was healthy, the Kaiser Permanente physicians had used

"C

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

these normal results to rule out alternatives to chronic fatigue syndrome.") Leslie's records show repeated references to fatigue, lethargy, malaise, and exercise intolerance. (*See* 21-3 at 649)

In addition to CFS/ME, Leslie has several autoimmune disorders that often co-occur with ME/CFS, such as Postural Orthostatic Tachycardia Syndrome ("POTS"). (Dkt. 21-3 at 59) Although she had two negative tilt table tests, that did not rule out POTS. (Dkt. 21-3 at 59) Clinical history and physical examinations are more important than positive tilt table results. (*Id.*) Leslie ultimately had a positive tilt table test. (Dkt. 21-3 at 59) Like CFS/ME, patients with POTS experience significant fatigue after modest activity levels. (*Id.*) Dr. Saperstein confirmed Mast Cell Activation Disorder ("MCAS") based on clinical findings and abnormal lab results, including elevated plasma and blood histamine levels and a positive response to MCAS stabilizing medication. (*Id.*) An MCAS flare causes allergic-type symptoms (*Id.*) He also confirmed Leslie has hypermobility spectrum disorder. (*Id.*)

A neuropsychological test confirmed impairment of cognitive function. Leslie also has a confirmed history of nausea and gastroparesis. For over two years, Leslie reported ongoing nausea and vomiting.  Although she gained weight when she started taking Protonix, Leslie's weight dramatically declined to the point that her BMI is underweight. If these major problems are not enough, Leslie has a history of migraines, cervical degenerative disc disease, facet pain, and a herniated disk. (Dkt. 21-13 at 198-201) She has positive MRI findings demonstrating moderate to severe neural foraminal stenosis. (Dkt. 21-3 at 160-51)

## II. UNDER THE TERMS OF LFG's POLICY, ANY OCCUPATION DISABILITY DEFINITION  REQUIRES THAT LESLIE BE ABLE TO WORK FULL TIME

LFG argues that the any occupation language present in the policy is not demanding standard. (Response at 17). LFG next claims that if Leslie can work part-

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12ᵀᴴ STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

time, she is not disabled from any occupation, relying on two cases *Shane v. Albertsons,* 381 F. Supp. 2d 1196, 1200 (C.D. Cal. 2005) and *Graeber v. Hewlett Packard Co. Employee Benefits,* 421 F. Supp. 2d 1256 (N.D. Cal. 2006).

The own occupation language in this policy still requires Leslie to perform work "with reasonable continuity." (Dkt. 21-1 at 8) She must also be able to perform the "material and substantial duties" of any occupation. (*Id.* at 11). The Policy defines that term as "responsibilities that are normally required to perform . . . any other occupation, and cannot be reasonably determined or modified." (*Id.*)

The ability to work full-time and show up to work is "normally required to perform . . . any other occupation. *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622, 2007 WL 1624644, at *34 (D. Ariz. June 4, 2007) (holding that the ability to work effectively and reliably is a requirement of employment. Leslie cannot meet the "normally required" element of attending work regularly and predicably. This requirement renders Leslie disabled if you consider her ME/CFS diagnosis exclusively.

Leslie has always maintained that she cannot work full-time with any reliability. LFG relies on its paper reviewers to support its claim that Leslie could work full-time. The reviewers concede that she has ME/CFS,  but never address how post-exertional fatigue impacts her ability to show up regularly. For claimants with ME/CFS there is a distinction between the amount of fatigue an individual experiences and how the fatigue limits functional capacities. *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322–23 (7th Cir. 2007); *see also Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622, 2007 WL 1624644, at *34 (D. Ariz. June 4, 2007). ("[A] total-disability determination cannot reasonably hinge on whether an employee is minimally capable, on a good day, at the right hour, of fulfilling her job duties in barely tolerable fashion."

### III. LFG's STRUCTURAL CONFLICT SHOULD FORCE THE COURT TO REVIEW ITS DECISION WITH HEIGHTENED SKEPTICISM.

#### A. *LFG's Undisclosed Affidavit of Kayla Bick Should Not be Considered*

LFG attaches the affidavit of Kayla Bick, the Director/Claims Shared Services as an Exhibit to its Response. (Dkt. 26-1 ¶1.) LFG cites the affidavit as proof that it has implemented a variety of procedures and processes to avoid conflicts of interest. (Dkt. 26 at 14; Dkt. 26-1 at ¶¶4-8) The Court should not consider this Declaration.

It was never disclosed. LFG disclosed the Administrative Record. (Dkt. 21) The end of fact discovery was September 27, 2024. (Dkt. 20 at ¶5) Further, the merits briefing paragraph of the order only provides for Leslie to provide relevant extrinsic evidence. (Dkt. 26-1 at ¶8). While there may be some dispute over whether ERISA is exempt from Rule 26 disclosure requirements, when a party intends to go outside the administrative record, that information should be disclosed. *See* Fed R. Civ. P. Rule 26(a)(1)(A) *see also James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 870 (N.D. Cal. 2014) (noting the potential need for Rule 26 disclosures in ERISA cases that involve conflict of interest).

The Declaration is conclusory and self-serving. For example, Ms. Bick contends that LFG intends to evaluate claims fairly and that the decision in this claim was not motivated by self-interest. ¶5. She also cites management checks in this case to make an accurate decision. ¶8. But the declaration does not provide any details as to how these goals are achieved. Had this declaration been disclosed, Plaintiff would have conducted discovery. If the court intends to admit the affidavit, Plaintiff should be entitled to conduct discovery to test the allegations. *Smith v. Unum Life Ins. Co. of Am.*, No. CV-21-01858-PHX-DGC, 2022 WL 1136639, at *3 (D. Ariz. Apr. 18, 2022) (permitting limited discovery into affidavit allegations)  One court did consider Ms. Bick's affidavit but there, the witness was disclosed as a person with knowledge.

*Torres v. Liberty Life Assurance Co. of Boston*, 4:13-CV-140, 2014 WL 4075937, at *1 (E.D. Tex. Aug. 14, 2014).

Ms. Bick's declaration seems to be the declaration LFG files in cases when conflict is at issue. (Exhibit 1, Affidavit of Karla Bick filed in *Sewell v. Lincoln*). The Court considered Ms. Bick's affidavit, but ultimately found that it was inconsistent with the way the file was managed. *Sewell v. Lincoln Nat'l Life Ins. Co.*, 2:23-CV-00317, 2025 WL 1667945, at *9 (S.D. Tex. Mar. 3, 2025), *report and recommendation adopted,* 2:23-CV-00317, 2025 WL 1276005 (S.D. Tex. May 2, 2025). The Court determined that evidence of the conflict could be found, for example, in LFG's expert reports that "did not read like impartial expert's reports." "The summary refusal of Plaintiff's evidence and Lincoln's experts' reports is akin to the frequent battle of experts our Courts see all the time. Defendants' experts and their reports are an indication to the undersigned that Lincoln is operating under an actual conflict of interest. Accordingly, this factor weighs against Lincoln." (*Id.*)

### B. LFG's initial Paper Reviewer, Dr. Mary Ellen Dirlam, found Leslie Disabled.

LFG's Response makes no mention of Dr. Dirlam's opinions, probably because LFG relied on Dr. Dirlam's opinions to pay Leslie's claim. Dr. Dirlam holds an M.D., a Ph.D., and is a fellow of the American College of Physicians. (Dkt. 21-12 at 89-90) She is also board certified in internal medicine. (*Id.*) In her first report on November 13, 2019, Dr. Dirlam identified poor physical condition and iron deficiency anemia as impairing physical conditions and major depressive disorder, panic attacks, and anxiety as behavioral health conditions. (Dkt. 21-13 at 218-19) In May 2020, LFG had Dr. Dirlam review Leslie's file again, after her CFS/ME diagnosis. (Dkt. 21-12 at 234-35) She concluded that Leslie would not have the stamina, stability, or strength to perform sedentary work. (*Id.* at 234) She also explained the course of CFS/ME (2931-32). Dr. Dirlam also noted that the short-term prognosis for ME/CFS is poor and 33%

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ◆ (602) 266-2667

of individual with ME/CFS still have functional impairment at two to four years. Dr. Dirlam also completed a review on November 5, 2020. (Dkt. 21-12 at 89-90) Again, she reiterates that Leslie continues to have functional impairment from ME/CFS. (Id) Dr. Dirlam determined that the medical evidence in Leslie's file *conclusively supports* the diagnosis of CFS and that Leslie suffers from functional impairment. (Dkt. 21-8 at 44-45) Dr. Dirlam did not review the file again.

### C. *The Court's Skepticism of LFG's Decision should be heightened because it Relied Solely on Paper Reviews*

Leslie established LFG never sought an IME. It is undisputed that in the Ninth Circuit, failure to request or conduct an IME raises questions about the thoroughness and accuracy of a determination. *Montour v. Hartford*, 588 F.3d at 634. An IME is particularly helpful if the quality and quantity of the medical evidence is in question. *Veronica L v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1040 (D. Or. 2022) (finding that inadequate e. Moreover, failure to conduct an IME is "dubious" for conditions [chronic fatigue] when subjective symptoms and credibility are involved. *Robertson*, 139 F. Supp. 3d at 1205. Multiple providers of Leslie's have concluded that her CFS and autoimmune issues disable her from full-time work. To overcome this proof, LFG should have sought an IME to determine her credibility. It did not. *See Veronica L. v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1040–41 (D. Or. 2022)

LFG responds that it did not seek an IME because the decision was made on August 12, 2021 and the appeal was filed on January 3, 2023. (Response, Dkt. 26 at 16-17) LFG claims an IME would not be useful in determining Leslie's condition on the date it terminated benefits. *Id.* That an IME was considered and rejected for that reason is not found in the claim notes. (Dkt. 21-3 at 2-7) (reflecting no discussion of an IME after appeal filed) It is also an interesting argument by LFG, as its peer reviewers all rendered decisions about Leslie's condition after the denial as well. The "time relevance" argument of evidence is not persuasive. *Thompson v. Standard Ins.*

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ◆ (602) 266-2667

*Co.*, 167 F.Supp.2d 1186, 1194 (D. Or. 2001) ("[t]he fact that a diagnosis is not made contemporaneously within the period that a claimant is insured does not undercut the viability of a later diagnosis based upon medically acceptable techniques. A diagnosis of plaintiff's condition may properly be made several years after the onset of the disability.") (internal quotation marks and citation omitted). LFG's excuse for not performing an IME is suspect.

### D. LFG's Reliance on its Investigative Findings Require Heightened Skepticism of its Decision.

> **1.** <u>After paying for 32 hours of surveillance, LFG was left with 57 seconds of video showing Leslie engaging in any activity</u>

The Ninth Circuit is skeptical of reviewer opinions that rely on video evidence of a claimant engaging in short spurts of activity over several days. "[T]hat Plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he [ ]is capable of sustaining activity in a full-time occupation." *Montour*, 588 F.3d at 633; *see also Bertelsen v. Hartford Life Ins. Co.*, 1 F. Supp. 3d 1060, 1073 (E.D. Cal. 2014) (criticizing over-reliance on surveillance).

LFG retained HUB to conduct 32 hours of surveillance on May 10, 2021, May 11, 2021, May 22, 2021, and May 23, 2021. (Dkt. 21-11 at 76) Only 57 seconds of surveillance were obtained on May 11, 2021. (Dkt. 21-11 at 77-87) On that day, Leslie had an appointment with NP Tonia Graham. She was at the office from 2:06 to 3:40. Notably, she did not drive; she parked in a handicapped spot. Nothing she did was inconsistent with her reported level of activity or her physicians' limitations. On each of the remaining days, there was no sign that Leslie engaged in any activity outside her home. Out of the total surveillance conducted, Hub found Leslie active for .049% of the time.[1] Yet, all the paper reviewers commented on the surveillance activity.

---

[1] 32 hours x 60 minutes = 1,920 minutes. 1,920 minutes x 60 seconds = 115,200 seconds.

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ◆ (602) 266-2667

**2.** LFG's social media mining is not reliable information to support the denial

Reliance on social media postings is an "illogical, implausible and unreasonable basis for a revocation of disability benefits" compared to medical records. *Williamson v. Aetna Life Ins. Co.*, 2019 WL 1446957, at *6–7 Social media posts are minimally informative and inherently inaccurate to predict capacity for sustained employment. (*Id.*) "Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (commenting on Social Security standard) Nothing in the record suggests that Leslie is incapable of standing, sitting, or posing for the time it takes to snap a photograph.

CoventBridge pulled Leslie's Facebook posts, copied her Instagram account, LinkedIn profile, and Etsy bead shop offerings. Dr. Ewald commented on this report that she "possibly" has a home business making jewelry that requires stringing beads. He noted multiple pictures from a trip Leslie took in June 2021. Dr. Ewald notes that Leslie is shown swimming, lying on the beach, and kneeling in a boat.

LFG makes much about Leslie's trip to the Bahamas. Leslie and her then-boyfriend, Clay, had planned the trip in advance of her worsening health condition. They were accompanied by Clay's mother, Linda Cornwell. (Dkt. 21-3 at 124) Ms. Cornwell notes that for the trip to the Bahamas, Leslie required a wheelchair in airports. (*Id.*) She also noted that the group opted for a charter boat tour to accommodate Leslie's limitations. (*Id.*) Travel is not probative of cognitive or physical ability. *Moody v. Liberty Life Assur. Co. of Boston*, 595 F. Supp. 2d 1090, 1099 n.3 (N.D. Cal. 2009) (traveling does not equate to physical and mental capacity to work full time)

LFG also cites Leslie's Etsy business as inconsistent with her disability. Leslie is entitled to have a hobby, hers is beads and jewelry. The Etsy posts show bracelets for sale for $5.00 and beads for sale to other jewelry makers. (Dkt. 21-4 at 464) "It is

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ♦ (602) 266-2667

conceivable that Plaintiff could engage in hobbies like gardening for short periods of time during times when her pain is waning but still be disabled from engaging in full-time work." *Stratton v. Life Ins. Co. of N. Am.*, 589 F. Supp. 3d 1145, 1182 (S.D. Cal. 2022) LFG made assumptions without any context for its conclusions. Again, LFG never obtains or seeks information about the time she works in the business or whether she earns a profit.

### E.  LFG and Dr. Obadia Misrepresented Discussions with NP Graham.

Dr. Obadia agreed that Leslie's primary diagnoses are CFS/ME, Ehlers-Danlos Syndrome ("EDS"), fatigue, and autonomic dysfunction. (Dkt. 21-4 at 396) She also acknowledged that Leslie had A-fib and ablations, POTS, small fiber neuropathy, iron deficiency anemia, gastroparesis, and irritable bowel syndrome (*Id.*) Dr. Obadia spoke with NP Graham and reported that she agreed Leslie could work. Dr. Obadia found that Leslie could work full time if she sat for over 50% of the time, stood and walked occasionally and lift/carry 10 pounds occasionally. (*Id.*) Dr. Obadia claims that she confirmed with NP Graham that Leslie was "currently and permanently capable of full-time work activity." (*Id.* at 396) Dr. Obadia claims that NP Graham indicated Leslie had no physical restrictions. (*Id.* at 399).

Dr. Obadia sent a letter to NP Graham on July 25, 2021, to confirm their conversation and NP Graham did not respond before LFG issued its denial on August 12, 2021. (Response at 7) When Leslie received the denial, she provided it to NP Graham, who immediately sent a response to adjuster Charles Martin that was dated August 12, but faxed on September 3, 2021. (Dkt. 21-4 at 311) NP Graham's letter disputes LFG's characterization of her alleged statements. (*Id.*) "Imagine my surprise when I read the 'conclusion' you said I made. Sadly, you outlined our conversation quiet (sic) differently than the information I presented to you. While this may be your practice to draw erroneous conclusion (sic), I did make myself perfectly clear that Ms. Marcus is still being medically evaluated and no definitive

diagnosis of disability had been made nor had any conclusion been drawn to preclude her from disability." (*Id.*) Misrepresenting conversations with treating physicians is not fair or mistake-free.

While LFG acknowledges receipt of this letter from NP Graham, it maintains that she never recanted her statement about sedentary work being beneficial to Leslie. (Response at 8) NP Graham could not recant what she did not say. In forming this opinion, however, Dr. Obadia blatantly misrepresented her conversation with NP Graham. Notwithstanding NP Graham's repudiation of Dr. Obadia's account of their conversation, this misrepresentation is central to LFG's claim denial. In the appeal determination, LFG then used this "preliminary" conversation between medical providers to claim that NP Graham believed that Leslie had no physical restrictions other than the reported memory loss and inability to lift a heavy weight above her head. (Dkt. 21-3 at 68-71) But, as NP Graham noted, this conclusion is taken out of context and misrepresents NP Graham's opinion that there was nothing to preclude Leslie from disability. (Dkt. 21-12 at 107)

### F. Dr. Ewald issues an opinion that Leslie can only work four hours per day and then changes his mind.

Dr. Ewald provided four different paper reviews to LFG on February 9, 2023 (Dkt. 21-3 at 441-508), March 9, 2023 (Dkt 21-3 at 479-80), June 8, 2023 (Dkt. 21-3 at 294-353), and October 9, 2023. (Dkt. 21-3 at 43-45) He acknowledges that Leslie primary impairing diagnosis is CFS/ME. (Dkt. 21-3 at 450) The relevant limitation Dr. Ewald notes is that Leslie could stand/walk/sit/use hands for fine manipulation as tolerated **for 4 hours per day**. Without citation to any medical resources, he suggests that specific treatment for CFS/ME is unclear, but maintaining a daily routine activity and increasing activity with the "hopes of increasing stamina is the goal." (*Id.*)

LFG asked Dr. Ewald to "provide more explanation as to why the claimant is limited to 4 hours per day." (Dkt. 21-3 at 479) He responds that the four hours was

SCHIFFMAN LAW OFFICE, P.C.
4506 N. 12TH STREET
PHOENIX, AZ 85014 ◆ (602) 266-2667

"an error" and that Leslie could work 8 hours per day. In quoting Dr. Ewald's report in LFG's Response, LFG inserts the 8-hour answer and indicates in a footnote that it corrected an error in the original report. (Dkt. 26 at n.50). Dr. Ewald's supplement was not just an errata, it was another report. Dr. Ewald never explains how he made the error. His "clarifying" report indicates that CFS would not prohibit her from doing these tasks in a workday and would be "beneficial" to increase her stamina and exercise tolerance. (*Id.*) The whole problem with CFS/ME is post-exertional malaise and the inability to sustain a high level of activity every day. *See* Dkt. 21-3 at 647-48 (outlining diagnostic criteria). Importantly, his restrictions note that Leslie could sit/stand/walk "as tolerated." He notes that she can bend/stoop, etc. "as tolerated." "[A]s tolerated" does not equal ability for full time work. *Marcin v. Reliance Standard Life Ins. Co.*, 861 F.3d 254, 264-67 (D.C. Cir. 2017),

### G. Dr. Ewald's suspicion of malingering and secondary gain is insufficient to support denial of the claim.

Dr. Ewald indicated that there may be "a component of secondary gain/malingering, or at least symptoms magnification" based on the surveillance and the investigative report." (Dkt. 21-3 at 451) He reiterated his "skepticism" about Leslie's diagnoses, POTS, EDS, dysautonomia, mast cell activation disorder, nausea, and vomiting. (Dkt. 21-3 at 296) He further noted that "he remained concerned that there may be a component of somaticizing from depression/anxiety or that behaviors/symptoms are due to secondary gain, or that there is a component of symptom magnification" (*Id.*) He repeats the same concerns in his addendum dated October 9, 2023. (Dkt. 21-3 at 43-44) Dr. Ewald's suspicions cannot be considered substantial evidence. No other medical provider who has treated Leslie found that she was malingering or had secondary gain issues. In fact, NP Graham specifically advised LFG that she did not see evidence of malingering. (Dkt. 21-4 at 311; Dkt. 21-3

at 81-82) These suspicions are essentially a credibility determination by Dr. Ewald. Credibility determinations in a paper review are improper.

### H. Dr. Nowell's Rejection of Leslie's Neuropsychological Testing is an abuse of discretion.

When Leslie provided neuropsychological testing results to LFG, which showed cognitive impairment, it had an in-house neuropsychologist, Dr. David Nowell, conduct a paper review. (Dkt. 21-3 at 454-66) Dr. Higgins' neurological report notes that on testing designed to detect malingering or low effort, Leslie's scores were within normal limits, rendering his opinions a valid and reliable estimate of her current level of neuropsychological function. (Dkt. 21-3 at 261) Dr. Nowell concedes that Leslie's performance fell in the impaired range on several tests. (*Id.*) Dr. Nowell reported that Leslie had low performance on non-verbal recall, a high number of commission errors in the continuous performance task. (*Id.* at 466)

Nevertheless, he found "It is not possible for an independent reviewer to form (sic) impression on the basis of these data alone, and review of the total record does not yield a consistent picture of abnormal exam finding or clinician observed cognitive dysfunction." Dr. Nowell stated that he could not evaluate the results without the raw scores. (Dkt. 21-2 at 4-6) Although he tried to speak with Dr. Higgins, he never requested the raw scores. Again, this was an opportunity for LFG to request its own neuropsychological IME, but it did not. LFG cannot reject Leslie's credible evidence.

### I. LFG's Transferable Skills Analysis Fails to Consider Leslie's Inability to Sustain Working

As part of its decision to deny Leslie benefits, LFG prepared an August 2021 transferable skills analysis and a 2023 update. From a physical standpoint, the vocational report did not consider limitations suggested by Leslie's physicians. It also fails to consider Leslie's cognitive impairment, despite determining that Leslie

had transferable skills that involved analyzing, planning, managing others, using math skills to interpret statistical reports, etc. Even if you considered that Leslie could perform sedentary work, she has established cognitive impairment. These occupations may be sedentary, but they require analytical thinking, managing others, communicating with customers and personnel, and the ability to do so consistently, which Leslie cannot do.

## IV.   CONCLUSION

LFG has no basis to question Leslie's subjective reports. Not a single physician other than LFG's paper reviewers questioned Leslie's veracity. It is an abuse of discretion to reject subjective findings. Surveillance and social media posts reflecting activities do not equate to a person's cognitive or physical ability to work.

Dated this 18th day of August 2025.

SCHIFFMAN LAW OFFICE, P.C.


By:    /s/ Lisa J. Counters
       Counsel for Plaintiff